**ORIGINAL**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.

WILLIAM B. LOVATO,

      Plaintiff,

v.

THOMAS LITTLE, Warden, Colorado State Penitentiary,

DAVID LISAC, Associate Warden, Colorado State Penitentiary,

MAJ. JOHN/JANE DOE #1, Custody Control/Security Supervisor, Colorado State Penitentiary,

LT. JAMES JOHNSON, Intel Unit Supervisor, Colorado State Penitentiary,

LT. DANIEL DENT, Intel Unit, Colorado State Penitentiary,

SGT. [?] WHITE, Intel Unit, Colorado State Penitentiary,

SGT. JACKIE SCHAAL, Housing Unit Supervisor, Colorado State Penitentiary,

JOHN/JANE DOE #2, Corrections Officer, Colorado State Penitentiary,

JOHN/JANE DOE #3, Corrections Officer, Colorado State Penitentiary,

LARRY WEINGARDNER, Case Manager Supervisor, Colorado State Penitentiary,
DIANA TRAVIS, Case Manager, Colorado State Penitentiary,

HALEY HANSON, Case Manager, Colorado State Penitentiary; and

JAY LUSK, OIG Investigator, Colorado Department of Corrections,

      Defendant(s).

**F I L E D**
UNITED STATES DISTRICT COURT
DENVER, COLORADO

**NOV 07 2022**

JEFFREY P. COLWELL
CLERK

*(List each named defendant on a separate line. If you cannot fit the names of all defendants in the space provided, please write "see attached" in the space above and attach an additional sheet of paper with the full list of names. The names listed in the above caption must be identical to those contained in Section B. Do not include addresses here.)*

---

## PRISONER COMPLAINT

---

Original form provided free of Charge by CO DOC Legal Services to
Offender  Lovato                          DOC# 113134
Date    JUL 27 2022

---

**NOTICE**

Federal Rule of Civil Procedure 5.2 addresses the privacy and security concerns resulting from public access to electronic court files. Under this rule, papers filed with the court should not contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include only: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number.

**Plaintiff need not send exhibits, affidavits, grievances, witness statements, or any other materials to the Clerk's Office with this complaint.**

---

## A.    PLAINTIFF INFORMATION

*You must notify the court of any changes to your address where case-related papers may be served by filing a notice of change of address. Failure to keep a current address on file with the court may result in dismissal of your case.*

WILLIAM B. LOVATO #113134

Arkansas Valley Correctional Facility
12750 State Highway 96 @ Lane 13
Ordway, Colorado 81034

Aka:    BENJI LOVATO
BENJAMIN W. LOVATO

*Indicate whether you are a prisoner or other confined person as follows: (check one)*

\_\_\_\_    Pretrial detainee
\_\_\_\_    Civilly committed detainee
\_\_\_\_    Immigration detainee
\_X\_    Convicted and sentenced state prisoner
\_\_\_\_    Convicted and sentenced federal prisoner
\_\_\_\_    Other: (*Please explain*)

## B.    DEFENDANT(S) INFORMATION

*Please list the following information for each defendant listed in the caption of the complaint. If more space is needed, use extra paper to provide the information requested. The additional pages regarding defendants should be labeled "B. DEFENDANT(S) INFORMATION."*

Defendant 1:    THOMAS LITTLE, Warden
Colorado State Penitentiary
P. O. Box 777
Cañon City, Colorado 81215

At the time the claim(s) in this complaint arose, was this defendant acting under color of state or federal law?  \_X\_ Yes \_\_\_ No (*check one*). Briefly explain:

Defendant Thomas Little was the Warden at the Colorado State Penitentiary ("CSP") and

2

Original form provided free of charge by CO DOC Legal Services to
Offender  Lovato                    DOC#  113134
Date  JUL 2 7 2022

at all relevant times was responsible for exercising the powers and performing the duties and functions assigned to him as the Warden at CSP under the supervision and control of the Executive Director of the Colorado Department of Corrections ("CDOC"). Additionally, Defendant Little was responsible for supervising all personnel within CSP; for ensuring that all personnel within CSP complied with and adhered to department and facility policies and procedures; for the safety and security of the employees, contract workers, volunteers, and inmates within CSP; and for taking all reasonable measures necessary to confine, separate or transfer inmate(s) who actively participate in disruptive and/or threatening Security Threat/Terrorist Group ("STG") behavior or who inflict or threaten to inflict harm to the employees, contract workers, volunteers, and inmates within CSP. Additionally, Defendant Little was responsible for initiating an Involuntary Protective Custody ("PC") review process if he had reason to believe based on available documents and records that Plaintiff was at risk of serious harm or serious injury if housed in CSP general population. Finally, Defendant Little was responsible for the care, safety and security of Plaintiff while he was confined at CSP.

Defendant 1 is being sued in his __X__ individual capacity.

Defendant 2:   DAVID LISAC, Associate Warden
Colorado State Penitentiary
P. O. Box 777
Cañon City, Colorado 81215

At the time the claim(s) in this complaint arose, was this defendant acting under color of state or federal law? __X__ Yes ___ No (check one). Briefly explain:

Defendant David Lisac was the Associate Warden at the Colorado State Penitentiary ("CSP") and at all relevant times was responsible for exercising the powers and performing the duties and functions assigned to him as Associate Warden under the supervision and control of the Warden of CSP, and the Executive Director of the Colorado Department of Corrections ("CDOC"). Defendant Lisac was responsible for the safety and security of employees, contract workers, volunteers, and inmates within the facility; for investigating and/or monitoring inmate(s) who actively participate in disruptive and/or threatening Security Threat/Terrorist Group ("STG") behavior; for investigating and/or monitoring inmate(s) who actively inflict or threaten to inflict harm to others; for maintaining and updating files on inmate(s) actively participating in disruptive and/or threatening STG behavior or who inflict or threaten to inflict harm to other inmates; and for taking all reasonable measures necessary to confine, separate or transfer inmate(s) who actively participate in disruptive and/or threatening STG behavior or who inflict or threaten to inflict harm to the employees, contract workers, volunteers, and inmates within the facility. Additionally, Defendant Lisac was for verifying and validating Plaintiff's recorded custody issues, for approving or denying the entering of Plaintiff's custody issues in his permanent record, for developing a recommendation for PC placement based solely on the facts and information gathered and presented during PC proceedings and based on Plaintiff's behavior, risk factors, and individual case planning objectives, and for presenting this information to the PC Review Board or for initiating an Involuntary Protective Custody ("PC") review process himself if he had reason to believe based on available documents and records that Plaintiff was at risk of serious harm or serious injury if housed in CSP general population. Finally, Defendant Lisac was responsible for the care, safety and security of Plaintiff while he was confined at CSP.

3

Original form provided free of charge by CO DOC Legal Services to
Offender __Lovato__   DOC# __113134__
Date __JUL 2 7 2022__

Defendant 2 is being sued in his _X_ individual capacity.

Defendant 3:   MAJ. JOHN/JANE DOE #1, Custody Control/Security Supervisor
Colorado State Penitentiary
P. O. Box 777
Cañon City, Colorado 81215

At the time the claim(s) in this complaint arose, was this defendant acting under color of state or federal law? _X_ Yes ___ No (*check one*). Briefly explain:

Defendant Major John/Jane Doe #1 was the Custody Control/Security Supervisor at the Colorado State Penitentiary ("CSP") and at all relevant times was responsible for exercising the powers and performing the duties and functions assigned to him as Custody Control/Security Major under the supervision and control of the Associate Warden and Warden of CSP, and the Executive Director of the Colorado Department of Corrections ("CDOC"). Defendant Doe #1 was responsible for the safety and security of employees, contract workers, volunteers, and inmates within the facility; for investigating and/or monitoring inmate(s) who actively participate in disruptive and/or threatening Security Threat/Terrorist Group ("STG") behavior; for investigating and monitoring inmate(s) who actively inflict or threaten to inflict harm to others; for maintaining and updating files on inmate(s) actively participating in disruptive and/or threatening STG behavior or who inflict or threaten to inflict harm to other inmates; and for taking all reasonable measures necessary to confine, separate or transfer inmate(s) who actively participate in disruptive and/or threatening STG behavior or who inflict or threaten to inflict harm to the employees, contract workers, volunteers, and inmates within the facility. Additionally, Defendant Doe #1 was responsible for initiating an Involuntary Protective Custody ("PC") review process himself if he had reason to believe based upon available documents and records that Plaintiff was at risk of serious harm or serious injury if housed in CSP general population. Finally, Defendant Doe #1 was responsible for the care, safety and security of Plaintiff while he was confined at CSP.

Defendant 3 is being sued in his _X_ individual capacity.

Defendant 4:   LT. JAMES JOHNSON, Intel Unit Supervisor
Colorado State Penitentiary
P. O. Box 777
Cañon City, Colorado 81215

At the time the claim(s) in this complaint arose, was this defendant acting under color of state or federal law? _X_ Yes ___ No (*check one*). Briefly explain:

Defendant Lieutenant James Johnson was the Intel Unit Supervisor at the Colorado State Penitentiary ("CSP") and at all relevant times was responsible for exercising the powers and performing the duties and functions assigned to him as Intel Unit Supervisor under the supervision and control of the Custody Control/Security Major, Associate Warden and Warden of CSP, and the Executive Director of the Colorado Department of Corrections ("CDOC"). Defendant Johnson was responsible for the safety and security of inmates within the CSP by gathering intelligence on, investigating, and monitoring inmate(s) who actively participate in disruptive and/or threatening Security Threat/Terrorist Group ("STG") behavior; for gathering intelligence on, investigating,

4

and monitoring inmate(s) who actively inflict or threaten to inflict harm to others; for maintaining and updating Intel/STG files on inmate(s) actively participating in disruptive and/or threatening STG behavior or who inflict or threaten to inflict harm to other inmates; and for taking all reasonable measures necessary to confine, separate or transfer inmate(s) who actively participate in disruptive and/or threatening STG behavior or who inflict or threaten to inflict harm to the employees, contract workers, volunteers, and other inmates within CSP. Additionally, Defendant Johnson was responsible for initiating an Involuntary Protective Custody ("PC") review process himself if he had as reason to believe based on available documents and records that Plaintiff was at risk of serious harm or serious injury if housed in CSP general population. Finally, Defendant Johnson was responsible for the care, safety and security of Plaintiff while he was confined at CSP.

Defendant 4 is being sued in his __X__ individual capacity.

Defendant 5:    LT. DANIEL DENT, Intel Unit
Colorado State Penitentiary
P. O. Box 777
Cañon City, Colorado 81215

At the time the claim(s) in this complaint arose, was this defendant acting under color of state or federal law? __X__ Yes ____ No (*check one*). Briefly explain:

Defendant Lieutenant Daniel Dent was an Intel Unit member at the Colorado State Penitentiary ("CSP") and at all relevant times was responsible for exercising the powers and performing the duties and functions assigned to him as an Intel Unit member under the supervision and control of the Intel Unit Supervisor, Custody Control/Security Supervisor, Associate Warden and Warden of CSP, and the Executive Director of the Colorado Department of Corrections ("CDOC"). Defendant Dent was responsible for the safety and security of inmates within the CSP by gathering intelligence on, investigating, and monitoring inmate(s) who actively participate in disruptive and/or threatening Security Threat/Terrorist Group ("STG") behavior; for gathering intelligence on, investigating, and monitoring inmate(s) who actively inflict or threaten to inflict harm to others; for maintaining and updating Intel/STG files on inmate(s) actively participating in disruptive and/or threatening STG behavior or who inflict or threaten to inflict harm to other inmates; and for taking all reasonable measures necessary to confine, separate or transfer inmate(s) who actively participate in disruptive and/or threatening STG behavior or who inflict or threaten to inflict harm to the employees, contract workers, volunteers, and within the facility. Additionally, Defendant Dent was responsible for initiating an Involuntary Protective Custody ("PC") review process himself if he had reason to believe based on available documents and records that Plaintiff was at risk of serious harm if housed in the CSP general population. Finally, Defendant Dent was responsible for the care, safety and security of Plaintiff while he was confined at CSP.

Defendant 4 is being sued in his __X__ individual capacity.

Defendant 6:    SGT. [?] WHITE, Intel Unit
Colorado State Penitentiary
P. O. Box 777
Cañon City, Colorado 81215

At the time the claim(s) in this complaint arose, was this defendant acting under color of

Original form provided free of Charge by CO DOC Legal Services to
Offender  Lovato
Date  JUL 27 2022                    DOC# 113134

state or federal law? _X_ Yes ___ No (*check one*). Briefly explain:

Defendant Sergeant [?] White was an Intel Unit member at the Colorado State Penitentiary ("CSP") and at all relevant times was responsible for exercising the powers and performing the duties and functions assigned to him as Intel/STG Lieutenant under the supervision and control of the Custody Control/Security Supervisor and Warden of CSP, and the Executive Director of the Colorado Department of Corrections ("CDOC"). Defendant White was responsible for the safety and security of inmates within the CSP by gathering intelligence on, investigating, and monitoring inmate(s) who actively participate in disruptive and/or threatening Security Threat/Terrorist Group ("STG") behavior; for gathering intelligence on, investigating, and monitoring inmate(s) who actively inflict or threaten to inflict harm to others; for maintaining and updating Intel/STG files on inmate(s) actively participating in disruptive and/or threatening STG behavior or who inflict or threaten to inflict harm to other inmates; and for taking all reasonable measures necessary to confine, separate or transfer inmate(s) who actively participate in disruptive and/or threatening STG behavior or who inflict or threaten to inflict harm to the employees, contract workers, volunteers, and within the facility. Additionally, Defendant Dent was responsible for initiating an Involuntary Protective Custody ("PC") review process himself if he had reason to believe based on available documents and records that Plaintiff was at risk of serious harm if housed in the CSP general population. Finally, Defendant Dent was responsible for the care, safety and security of Plaintiff while he was confined at CSP.

Defendant 5 is being sued in his _X_ individual and/or ___ official capacity.

Defendant 7:    JACKIE SCHAAL, Sergeant
Colorado State Penitentiary
P. O. Box 777
Cañon City, Colorado 81215

At the time the claim(s) in this complaint arose, was this defendant acting under color of state or federal law? _X_ Yes ___ No (*check one*). Briefly explain:

Defendant Jackie Schaal was a Unit Sergeant at the Colorado State Penitentiary ("CSP"), and at all relevant times was responsible for exercising the powers and performing the duties and functions assigned to him as a Housing Unit Sergeant assigned to the Closed Custody Transition Unit ("CCTU") under the supervision and control of the Housing Unit Lieutenant, the Custody Control/Security Supervisor and the Warden of CSP. Defendant Schaal was responsible for the safety and security of inmate(s) in the housing unit; for ensuring that housing unit and cell doors are secured at all times; for ensuring that inmates are secured within their cells when not on authorized or scheduled movement(s); for ensuring the separation of inmate(s) in the housing unit with Security Threat/Terrorist Group ("STG") custody issues from other inmate(s) who actively participate in disruptive and/or threatening STG behavior; for reporting inmate(s) in the housing unit with STG custody issues to the Unit Lieutenant, the Shift Commander, the facility Intel/STG unit, the Custody Control/Security Major and all other relevant facility staff; for maintaining and updating chronological records on inmate(s) in the housing unit who actively inflict or threaten to inflict harm to others; for maintaining and updating chronological records on inmate(s) in the housing unit who actively participate in disruptive and/or threatening STG behavior or who inflict or threaten to inflict harm to other inmates; for taking all reasonable measures necessary to confine,

6

Original form provided free of Charge by CO DOC Legal Services to
Offender Loveto                    DOC# 113134
Date JUL 27 2022

and/or separate inmate(s) in the housing unit who actively participate in disruptive and/or threatening STG behavior or who inflict or threaten to inflict harm to the employees, contract workers, volunteers, and other inmates within the facility. Additionally, Defendant Schaal was responsible for initiating the Involuntary Protective Custody ("PC") review process if he had reason to believe (based on available documents and records) that Plaintiff was at risk of serious harm if housed in the CSP general population. Finally, Defendant Schaal was responsible for the care, safety and security of Plaintiff while he was confined in Housing Unit B of CSP.

Defendant 7 is being sued in his _X_ individual and/or ___ official capacity.

Defendant 8:    JOHN/JANE DOE #2, Corrections Officer
                Colorado State Penitentiary
                P. O. Box 777
                Cañon City, Colorado 81215

At the time the claim(s) in this complaint arose, was this defendant acting under color of state or federal law? _X_ Yes ___ No (check one). Briefly explain:

Defendant John/Jane Doe #2 was a Corrections Officer at the Colorado State Penitentiary ("CSP"), and at all relevant times was responsible for exercising the powers and performing the duties and functions assigned to him as a Corrections Officer assigned to the Closed Custody Transition Unit ("CCTU") under the supervision and control of the Housing Unit Sergeant, the Housing Unit Lieutenant and the Warden of CSP. Defendant Doe #2 was responsible for the safety and security of inmate(s) in the housing unit; for ensuring that housing unit and cell doors are secured at all times; for ensuring that inmates are secured within their cells when not on authorized or scheduled movement(s); for monitoring inmate(s) in the housing unit with Security Threat/Terrorist Group ("STG") issues; for monitoring inmate(s) in the housing unit who actively participate in disruptive and/or threatening STG behavior; for reporting inmate(s) in the housing unit with STG issues to the Unit Sergeant, the Unit Lieutenant, the Shift Commander, the facility Intel/STG unit, the Custody Control/Security Supervisor and all other relevant facility staff; for maintaining and updating chronological records on inmate(s) in the housing unit who have STG issues; for maintaining and updating chronological records on inmate(s) in the housing unit who actively inflict or threaten to inflict harm to others; for maintaining and updating chronological records on inmate(s) in the housing unit who actively participate in disruptive and/or threatening STG behavior or who inflict or threaten to inflict harm to other inmates; for taking all reasonable measures necessary to confine, and/or separate any inmate(s) in the housing unit who actively participate in disruptive and/or threatening STG behavior or who inflict or threaten to inflict harm to the employees, contract workers, volunteers, and other inmates within the facility. Finally, Defendant Doe #2 was responsible for the care, safety and security of Plaintiff while he was confined in Housing Unit B of CSP.

Defendant 8 is being sued in his/her _X_ individual and/or ___ official capacity.

Defendant 9:    JOHN/JANE DOE #3, Corrections Officer
                Colorado State Penitentiary
                P. O. Box 777
                Cañon City, Colorado 81215

Original form provided free of Charge by CO DOC Legal Services to
Offender  Loyato                    DOC# 113134
Date  JUL 27 2022

At the time the claim(s) in this complaint arose, was this defendant acting under color of state or federal law? _X_ Yes ___ No (*check one*). Briefly explain:

Defendant John/Jane Doe #3 was a Corrections Officer at the Colorado State Penitentiary ("CSP"), and at all relevant times, was responsible for exercising the powers and performing the duties and functions assigned to him as a Corrections Officer assigned to the Closed Custody Transition Unit ("CCTU") under the supervision and control of the Unit Sergeant, the Unit Lieutenant and the Warden of CSP. Defendant Doe #3 was responsible for the safety and security of inmate(s) in the housing unit; for ensuring that housing unit and cell doors are secured at all times; for ensuring that inmates are secured within their cells when not on authorized or scheduled movement(s); for monitoring inmate(s) in the housing unit with Security Threat/Terrorist Group ("STG") issues; for monitoring inmate(s) in the housing unit who actively participate in disruptive and/or threatening STG behavior; for reporting inmate(s) in the housing unit with STG issues to the Unit Sergeant, the Unit Lieutenant, the Shift Commander, the facility Intel/STG unit, the Custody Control/Security Supervisor and all other relevant facility staff; for maintaining and updating chronological records on inmate(s) in the housing unit who have STG issues; for maintaining and updating chronological records on inmate(s) in the housing unit who actively inflict or threaten to inflict harm to others; for maintaining and updating chronological records on inmate(s) in the housing unit who actively participate in disruptive and/or threatening STG behavior or who inflict or threaten to inflict harm to other inmates; for taking all reasonable measures necessary to confine, and/or separate any inmate(s) in the housing unit who actively participate in disruptive and/or threatening STG behavior or who inflict or threaten to inflict harm to the employees, contract workers, volunteers, and other inmates within the facility. Finally, Defendant Doe #3 was responsible for the care, safety and security of Plaintiff while he was confined in Housing Unit B of CSP.

Defendant 9 is being sued in his/her _X_ individual and/or ___ official capacity.

Defendant 10:    LARRY WEINGARDNER, Case Manager Supervisor
Colorado State Penitentiary
P. O. Box 777
Cañon City, Colorado 81215

At the time the claim(s) in this complaint arose, was this defendant acting under color of state or federal law? _X_ Yes ___ No (*check one*). Briefly explain:

Defendant Larry Weingardner was the Case Manager Supervisor at the Colorado State Penitentiary ("CSP"), and at all relevant times was responsible for exercising the powers and performing the duties and functions assigned to him as the Case Manager Supervisor under the supervision and control of the Associate Warden and Warden of CSP, and the Executive Director of the Colorado Department of Corrections ("CDOC"). Defendant Weingardner was responsible for the safety and security of inmates within the facility by ensuring the separation of inmates with Security Threat/Terrorist Group ("STG") issues from other inmate(s) who actively participate in disruptive and/or threatening STG behavior; for reporting inmate(s) in the facility with STG issues to the Shift Commander, the facility Intel/STG unit, the Custody Control/Security Supervisor and all other relevant facility staff; for maintaining and updating case management records on

Original form provided free of Charge by CO DOC Legal Services to
Offender ___Lovato___ DOC# 113134
Date ___JUL 2 7 2022___

inmate(s) who have STG issues; for maintaining and updating case management records on inmates who actively inflict or threaten to inflict harm to others; for maintaining and updating case management records on inmate(s) actively participating in disruptive and/or threatening STG behavior or who inflict or threaten to inflict harm to other inmates; and for taking all reasonable measures necessary to confine, separate or transfer inmate(s) who actively participate in disruptive and/or threatening STG behavior or who inflict or threaten to inflict harm to the employees, contract workers, volunteers, and other inmates within the facility. Additionally, Defendant Weingardner was responsible for initiating the Involuntary Protective Custody ("PC") review process if he had reason to believe (based on available documents and records) that Plaintiff was at risk of serious harm if housed in the CSP general population. Finally, Defendant Weingardner was responsible for the care, safety and security of Plaintiff while he was confined at CSP.

Defendant 10 is being sued in his  X  individual and/or ___ official capacity.

Defendant 11:    DIANA TRAVIS, Case Manager
Colorado State Penitentiary
P. O. Box 777
Cañon City, Colorado 81215

At the time the claim(s) in this complaint arose, was this defendant acting under color of state or federal law?  X  Yes ___ No (check one). Briefly explain:

Defendant Diana Travis was a Case Manager at the Colorado State Penitentiary ("CSP"), and at all relevant times was responsible for exercising the powers and performing the duties and functions assigned to her as a Case Manager under the supervision and control of the Case Manager Supervisor, the Associate Warden and Warden of CSP, and the Executive Director of the Colorado Department of Corrections ("CDOC"). Defendant Travis was responsible for the safety and security of inmate(s) on her case load; for ensuring the separation of inmate(s) on her case load with Security Threat/Terrorist Group ("STG") issues from other inmate(s) who actively participate in disruptive and/or threatening STG behavior; for reporting inmate(s) on her case-load with STG issues to the Case Manager III, Unit Sergeant, the Unit Lieutenant, the Shift Commander, the facility Intel/STG unit, the Custody Control/Security Supervisor and all other relevant facility staff; for maintaining and updating case management records on inmate(s) who have STG issues; for maintaining and updating case management records on inmates who actively inflict or threaten to inflict harm to others; for maintaining and updating case management records on inmate(s) actively participating in disruptive and/or threatening STG behavior or who inflict or threaten to inflict harm to other inmates; and for taking all reasonable measures necessary to confine, separate or transfer any inmate(s) who actively participate in disruptive and/or threatening STG behavior or who inflict or threaten to inflict harm to the employees, contract workers, volunteers, and other inmates within the facility. Additionally, Defendant Travis was responsible for initiating the Involuntary Protective Custody ("PC") review process if she had reason to believe (based on available documents and records) that Plaintiff was at risk of serious harm if housed in the CSP general population. Finally, Defendant Travis was responsible for the care, safety and security of Plaintiff while he was confined at CSP.

Defendant 11 is being sued in her  X  individual and/or ___ official capacity.
Defendant 12:    HALEY HANSON, Case Manager

Original form provided free of Charge by CO DOC Legal Services to
Offender  Lovato                         DOC#  113134.
Date  JUL 27 2022

Colorado State Penitentiary
P. O. Box 777
Cañon City, Colorado 81215

At the time the claim(s) in this complaint arose, was this defendant acting under color of state or federal law? _X_ Yes ___ No (*check one*). Briefly explain:

Defendant Haley Hanson was a Case Manager at the Colorado State Penitentiary ("CSP"), and at all relevant times was responsible for exercising the powers and performing the duties and functions assigned to her as a Case Manager under the supervision and control of the Case Manager Supervisor, the Associate Warden and Warden of CSP, and the Executive Director of the Colorado Department of Corrections ("CDOC"). Defendant Hanson was responsible for the safety and security of inmate(s) on her case load; for ensuring the separation of inmate(s) on her case load with Security Threat/Terrorist Group ("STG") issues from other inmate(s) who actively participate in disruptive and/or threatening STG behavior; for reporting inmate(s) on her case-load with STG issues to the Case Manager Supervisor, Unit Sergeant, the Unit Lieutenant, the Shift Commander, the facility Intel/STG unit, the Custody Control/Security Supervisor and all other relevant facility staff; for maintaining and updating case management records on inmate(s) who have STG issues; for maintaining and updating case management records on inmates who actively inflict or threaten to inflict harm to others; for maintaining and updating case management records on inmate(s) actively participating in disruptive and/or threatening STG behavior or who inflict or threaten to inflict harm to other inmates; and for taking all reasonable measures necessary to confine, separate or transfer any inmate(s) who actively participate in disruptive and/or threatening STG behavior or who inflict or threaten to inflict harm to the employees, contract workers, volunteers, and other inmates within the facility. Additionally, Defendant Hanson was responsible for initiating the Involuntary Protective Custody ("PC") review process if she had reason to believe (based on available documents and records) that Plaintiff was at risk of serious harm if housed in the CSP general population. Finally, Defendant Hanson was responsible for the care, safety and security of Plaintiff while he was confined at CSP.

Defendant 12 is being sued in her _X_ individual and/or ___ official capacity.

Defendant 13:    JAY LUSK, OIG Investigator
Colorado Department of Corrections
Central Office
1250 Academy Park Loop
Colorado Springs, Colorado 80910

At the time the claim(s) in this complaint arose, was this defendant acting under color of state or federal law? _X_ Yes ___ No (*check one*). Briefly explain:

Defendant Jay Lusk was an OIG ("Office of the Inspector General") Investigator at the Colorado State Penitentiary ("CSP"), and at all relevant times was responsible for exercising the powers and performing the duties and functions assigned to him as an OIG Investigator under the supervision and control of the Inspector General and the Executive Director of the Colorado Department of Corrections ("CDOC"). Defendant Lusk was responsible for (among other duties) the safety and security of inmates within the CDOC/CSP by gathering intelligence on, investigating, and monitoring inmate(s) who actively participate in disruptive and/or threatening

10

Original form provided free of Charge by CO DOC Legal Services to
Offender Lovato                    DOC# 113134
Date JUL 27 2022

Security Threat/Terrorist Group ("STG") behavior; for gathering intelligence on, investigating and monitoring inmate(s) who actively inflict or threaten to inflict harm to others; for maintaining and updating Intel/STG files on inmate(s) actively participating in disruptive and/or threatening STG behavior or who inflict or threaten to inflict harm to other inmates; and for taking all reasonable measures necessary to confine, separate or transfer inmate(s) who actively participate in disruptive and/or threatening STG behavior or who inflict or threaten to inflict harm to the employees, contract workers, volunteers, and other inmates within the CDOC/CSP. Additionally, Defendant Lusk was responsible for initiating the Involuntary Protective Custody ("PC") review process if he had reason to believe (based on available documents and records) that Plaintiff was at risk of serious harm if housed in the CSP general population. Finally, Defendant Lusk was responsible for the care, safety and security of Plaintiff while he was confined at CSP.

Defendant 13 is being sued in his _X_ individual and/or ___ official capacity.

## C.    JURISDICTION

*Indicate the federal legal basis for your claim(s): (check all that apply)*

_X_    42 U.S.C. § 1983 (state, county, and municipal defendants)

____    *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971) (federal defendants)

_X_    Other: 42 U.S.C. § 1997 (Civil Rights of Institutionalized Persons Act) and 28 USCS § 1331 (Original Jurisdiction).

## D.    STATEMENT OF CLAIM(S)

*State clearly and concisely every claim that you are asserting in this action. For each claim, specify the right that allegedly has been violated and state all facts that support your claim, including the date(s) on which the incident(s) occurred, the name(s) of the specific person(s) involved in each claim, and the specific facts that show how each person was involved in each claim. You do not need to cite specific legal cases to support your claim(s). If additional space is needed to describe any claim or to assert additional claims, use extra paper to continue that claim or to assert the additional claim(s). Please indicate that additional paper is attached and label the additional pages regarding the statement of claims as "D. STATEMENT OF CLAIMS."*

### FACTUAL BACKGROUND

In November 1998, Plaintiff was involved in a high-profile, gang-related murder in Denver, Colorado. [1] The incident resulted in the death of an Oldies-13 gang member. Plaintiff's Co-Defendant, a Chi-30s gang member and the actual shooter, immediately implicated Plaintiff as the "shooter" in the incident, and made a video tape statement against the Plaintiff which in turn forced

---

[1] Plaintiff was a member of the Chiqui-30s ("Chi-30s") street gang, which was active in the Denver, Colorado metro area. The Chi-30s were notoriously violent and were involved in numerous criminal activities (i.e., selling drugs, committing acts of extortion, violent home invasions, robberies, etc.) and in violent encounters with members of rival street gangs.

11

Original form provided free of Charge by CO DOC Legal Services to
Offender  Lovato                     DOC#  113134
Date    JUL 27 2022

the Plaintiff to get a lawyer and defend himself against his lying co-defendant Ruben Pasillas. [2] Plaintiff was eventually charged with Accessory to Murder, receiving a four-year sentence in the Colorado Department of Corrections ("CDOC"), the sentence being deferred to probation in the plea deal, because the co-defendant made a false statement against me on

Following the November 1998 shooting incident, Plaintiff from all criminal and gang-related activities. Because he had disengaged from his previous lifestyle, had provided information regarding Chi-30s gang-related activities to the Denver District Attorney's Office and the Denver Police Department, and had testified against a Chi-30s gang member, Plaintiff was automatically considered a snitch by all Hispanic/Hispanic gang members active in Colorado and the CDOC and was marked for death.

Since the November 1998 shooting incident there have been several documented death threats made against Plaintiff and his family by known Hispanic/Hispanic gang members. During this same period, and while Plaintiff was on probation, he was assaulted multiple times in retaliation for his having "snitched" on Chi-30s gang members. In response to this situation, Plaintiff developed mental health issues and began experiencing prolonged episodes of anxiety, [deep] depression, paranoia, and self-loathing and started using drugs, In addition, Plaintiff began committing crimes to both support his increasingly heavy drug use and to protect himself and his family.

In April 2000, Plaintiff was involved in an incident with Denver Police, where he was charged with Vehicular Eluding. Plaintiff plead guilty to the charge and received a deferred sentence of three years in the CDOC.

In August 2001, Plaintiff was involved in an alcohol and drug-induced incident in Denver, Colorado which resulted in his being charged with and pleading guilty to Robbery and being sentenced to four years in the CDOC. During his incarceration, Plaintiff had several violent encounters with Chi-30s and Oldies-13s gang members while at the Buena Vista Correctional Complex, the Four Mile Correctional Complex, the Bent County Correctional Facility, and the Fremont Correctional Facility.

In May 2005, Plaintiff was paroled to his mandatory release date.

In September 2005, Plaintiff was involved in a shoot-out with his fiancée's ex-boyfriend while leaving a birthday party at his mother-in-laws house. Although the Denver Police Department attempted to turn the incident into a "gang-related" shooting, no evidence was ever presented to establish this fact as Plaintiff had been "disassociated" from all gang-related and criminal activity. Following a lengthy jury trial, Plaintiff was found guilty of Reckless Endangerment, Assault 2, Firearm – Illegal Discharge, and Attempted First Degree Murder – After Deliberation and was sentenced to a term of 128 years in the CDOC.

On November 16, 2006, Plaintiff was transferred to Denver Reception and Diagnostic Center ("DRDC"). Plaintiff was interviewed by DRDC Intel/Security Threat-Terrorist Group ("STG") and Case Management staff, where he recounted his prior criminal history and his prior membership in the Chi-30s street gang. Plaintiff told DRDC staff he was no longer affiliated with the Chi-30s, as he had "disassociated" himself from all criminal and gang-related activities. Plaintiff also told DRDC staff: (1) he had testified against a Chi-30s gang member in 1998, (2) he had been

---

[2] Plaintiff was interviewed on several occasions as part of the investigations conducted by the Denver District Attorney's Office and Denver Police Department. During the interviews Plaintiff was fully debriefed, providing information on Chi-30s gang members and gang-related criminal activities in addition to his providing testimony against his Chi-30s co-defendant.

Original form provided free of Charge by CO DOC Legal Services to
Offender    Lovato                    DOC# 113134
Date    JUL 27 2022

labeled a snitch by Chi-30s and Oldies 13 gang members, (3) there was a "green light" on him, and (4) he had been receiving death threats ever since.

. The "Diagnostic Narrative Summary" compiled by the DRDC Assessment & Classification Section (Patricia Quinn) records Plaintiff's (1) custody issues with Chi-30s, Oldies-13s, Hispanic Bloods, Sureños 13s, and Norteños 14s gang members (hereinafter referred to as "Hispanic" gang members), (2) being "victim prone" due to previous affiliations with gangs, (3) being "victim prone" due to testifying against his co-defendant, and (4) having several enemies.[3] Plaintiff told DRDC staff that he feared for his safety if placed in general population of CDOC facilities with Hispanic gang members.

DRDC staff assured Plaintiff they were aware of the facts in his record and that notations would be made in his CDOC files to keep him separate from members of Hispanic gang members while in the CDOC.

On December 7, 2006, Plaintiff was transferred to Sterling Correctional Facility ("SCF"). Plaintiff was interviewed by SCF Intel/STG and Case Management staff, where he recounted his prior criminal history and his prior membership in the Chi-30s street gang. Plaintiff told DRDC staff he was no longer affiliated with the Chi-30s, as he had "disassociated" himself from all criminal and gang-related activities. Plaintiff also told SCF staff: (1) he had testified against a Chi-30s gang member in 1998, (2) he had been labeled a snitch by Chi-30s and Oldies 13 gang members, (3) there was a "green light" on him, and (4) he had been receiving death threats ever since. Finally, Plaintiff told SCF staff that he feared for his safety if placed in general population with Hispanic gang members. SCF staff assured Plaintiff they were aware of the facts in his record and assured him he would be kept separate from Hispanic gang members while at SCF.

Although SCF staff possessed this information and had made several assurances to Plaintiff, they placed him in general population with active Hispanic gang members.

On April 26, 2007, Plaintiff was in his cell watching television when he was "brutally" assaulted by two members of the Oldies 13 gang wielding fists, feet, and prison-made weapons capable of causing fatal injuries. First Responders noted blood on the sink, walls, and floor of Plaintiff's cell. During the investigation which followed the brutal assault SCF Intel/STG staff interviewed Plaintiff where he stated: (1) he had been placed in general population with Hispanic gang members, (2) he had been housed in the living unit (LU-3) with Hispanic gang members, (3) he had received death threats, and (4) he had reported this information to LU-3 housing unit staff but had been ignored. Plaintiff told SCF Intel/STG staff that he feared for his safety if placed back in general population with Hispanic gang members. Following the assault SCF staff arranged Plaintiff's transfer to another CDOC facility due to the severity of his custody issues at SCF.

In January/February 2008, Plaintiff was transferred to the Centennial Correctional Facility ("CCF") to participate in the CDOC Diversion Program.

In August 2008, Plaintiff was transferred to Buena Vista Correctional Complex ("BVCC"). Plaintiff was interviewed by BVCC Intel/STG and Case Management staff, where he recounted his prior criminal history and his prior membership in the Chi-30s street gang. Plaintiff told BVCC staff he was no longer affiliated with the Chi-30s, as he had "disassociated" himself from all criminal and gang-related activities. Plaintiff also told BVCC staff: (1) he had testified against a Chi-30s gang member in 1998, (2) he had been labeled a snitch by Chi-30s and Oldies 13 gang members, (3) there was a "green light" on him, and (4) he had been receiving death threats ever

---

[3] While this CDOC document records at least seven specific custody issues, they have been redacted by staff on the copies provided to Plaintiff.

Original form provided free of charge by CO DOC Legal Services to
Offender    Lovato                    DOC# 113134
Date    JUL 27 2022

since. Finally, Plaintiff told BVCC staff that he feared for his safety if placed in general population with Hispanic gang members. BVCC staff assured Plaintiff they were aware of the facts in his record and assured him he would be kept separate from Hispanic gang members.

Although BVCC staff possessed this information and had made several assurances to Plaintiff, they placed him in general population with active Hispanic gang members.

On October 1, 2008, Plaintiff was transferred to Arkansas Valley Correctional Facility ("AVCF") to participate in Mental Health programs. Plaintiff was interviewed by AVCF Intel/STG and Case Management staff where he recounted his prior criminal history and his prior membership in the Chi-30s street gang. Plaintiff told AVCF staff he was no longer affiliated with the Chi-30s, as he had "disassociated" himself from all criminal and gang-related activities. Plaintiff also told AVCF staff: (1) he had testified against a Chi-30s gang member in 1998, (2) he had been labeled a snitch by Chi-30s and Oldies 13 gang members, (3) there was a "green light" on him, and (4) he had been receiving death threats ever since. Finally, Plaintiff told AVCF staff that he feared for his safety if placed in general population with Hispanic gang members. AVCF staff assured Plaintiff they were aware of the facts in his record and assured him he would be kept separate from Hispanic gang members while at AVCF.

Although AVCF staff possessed this information and had made several assurances to Plaintiff, they placed him in general population with active Hispanic gang members.

On May 31, 2009, a fight occurred between rival "Bloods" and "Crips" gang members in the AVCF gym. Recreation staff deployed Oleoresin Capsicum ("OC") chemical agents and Phase One responders were called. All offenders, including Plaintiff, were moved to the outside weight pile. There, a second fight between the same rival black gangs began. Recreation staff and Phase One responders deployed chemical agents and Phase Two responders were called. At this time, Plaintiff he was jumped by three Hispanic gang members using the disruptions in the gym and on the outside weight pile to target Plaintiff while staff were otherwise occupied. Phase Two responders deployed 37mm rounds and an "Ispra-jet" chemical agent to restore order. During the investigation which followed these incidents, AVCF Intel/STG staff interviewed Plaintiff where he stated (1) he had been placed in general population with several Hispanic gang members, (2) he had been housed in the living unit (LU-4) with several Hispanic gang members, (3) he had received multiple death threats, and (4) he had reported this information to housing unit staff but had been ignored. Plaintiff told AVCF staff that he feared for his safety if placed back in general population with Hispanic gang members. Following this incident AVCF staff arranged Plaintiff's transfer to another CDOC facility.

On July 6, 2009, Plaintiff was transferred to Limon Correctional Facility ("LCF"). Plaintiff was interviewed by LCF Intel/STG and Case Management staff, where he recounted his prior criminal history and his prior membership in the Chi-30s street gang. Plaintiff told LCF staff he was no longer affiliated with the Chi-30s as he had "disassociated" himself from all criminal and gang-related activities. Plaintiff also told LCF staff: (1) he had testified against a Chi-30s gang member in 1998, (2) he had been labeled a snitch by Chi-30s and Oldies 13 gang members, (3) there was a "green light" on him, and (4) he had been receiving death threats ever since. Finally, Plaintiff told LCF staff that he feared for his safety if placed in general population with Hispanic gang members. LCF staff assured Plaintiff they were aware of the facts in his record and assured him he would be kept separate from members of these gangs.

Although LCF staff possessed this information and had made several assurances to Plaintiff, they placed him in general population with active Hispanic gang members.

On July 7, 2009, LCF (Sherwyn Phillip) noted in Plaintiff's records that he had several

14

Original form provided free of Charge by CO DOC Legal Services to
Offender  Lovato
DOC# 113134
Date  JUL 27 2022

enemies at LCF and was not willing to go to general population. A second entry by Phillip states that an Incident Report was written.

On July 20, 2009, LCF staff were contacted by Plaintiff's mother regarding his custody issues at LCF and his need to be immediately transferred out of LCF for his safety.

On July 29, 2009, Plaintiff was assaulted by three Hispanic gang members in his living unit. Following this incident LCF staff arranged Plaintiff's transfer to another CDOC facility.

On August 17, 2009, Plaintiff was transferred to CCF to participate in the CDOC Offender's with Mental Illness ("OMI") program.

On January 13, 2012, Plaintiff was again transferred to LCF. Plaintiff was interviewed by LCF Intel/STG and Case Management staff, where he (again) recounted his prior criminal history and his prior membership in the Chi-30s street gang. Plaintiff (again) told LCF staff he was no longer affiliated with the Chi-30s as he had "disassociated" himself from all criminal and gang-related activities. Plaintiff also (again) told LCF staff: (1) he had testified against a Chi-30s gang member in 1998, (2) he had been labeled a snitch by Chi-30s and Oldies 13 gang members, (3) there was a "green light" on him, and (4) he had been receiving death threats ever since. Finally, Plaintiff told LCF staff of his previous problems with Hispanic gang members while in general population at LCF in 2009. Finally, Plaintiff (again) told LCF staff that he feared for his safety if placed in general population with Hispanic gang members. LCF staff (again) assured Plaintiff they were aware of the facts in his record and his custody issues at LCF in 2009, and (again) assured him he would be kept separate from Hispanic gang members while at LCF.

Although LCF staff possessed this information and had made several assurances to Plaintiff, they (again) placed him in general population with active Hispanic gang members.

On March 29, 2012, Plaintiff was assaulted in the LCF courtyard upon leaving the dining hall by a member of the Oldies 13 gang. AVCF staff deployed OC and a single Colt AR-15 round to restore order. During the investigation which followed this incident, LCF Intel/STG staff interviewed Plaintiff where he stated that (1) he had been placed in general population with several active Hispanic gang members, (2) he had been housed in the living unit (LU-2) with active Hispanic gang members, (3) he had received death threats, (4) he had reported this information to housing unit staff but had been ignored, and (5) he had been assaulted by three Hispanic gang members at LCF in July 2009. Plaintiff told LCF staff that he feared for his safety if placed back in general population with active Hispanic gang members. Following this incident Plaintiff was returned to general population.

On April 19, 2012, LCF staff (James Gillis) noted in Plaintiff's records his having contact with a Hispanic gang member about testifying against his co-defendant, and that he felt uncomfortable in LCF.

On July 31, 2012, LCF staff (Mark Anthony and Sherwyn Phillip) noted in Plaintiff's records his having custody issues at LCF and arranged Plaintiff's transfer to another CDOC facility.

In August, 2012, Plaintiff was again transferred to SCF. Plaintiff was interviewed by SCF Intel/STG and Case Management staff, where he (again) recounted his prior criminal history and his prior membership in the Chi-30s street gang. Plaintiff (again) told SCF staff he was no longer affiliated with the Chi-30s as he had "disassociated" himself from all criminal and gang-related activities. Plaintiff also (again) told SCF staff: (1) he had testified against a Chi-30s gang member in 1998, (2) he had been labeled a snitch by Chi-30s and Oldies 13 gang members, (3) there was a "green light" on him, and (4) he had been receiving death threats ever since. Finally, Plaintiff told SCF staff of his previous problems with Hispanic gang members while in general population at

Original form provided free of Charge by CO DOC Legal Services to
Offender _Lovato_    DOC# _173134_
Date _JUL 2 7 2022_

SCF in April 2007. Plaintiff (again) told SCF staff that he feared for his safety if placed in general population with Hispanic gang members. SCF staff (again) assured Plaintiff they were aware of the facts in his record and his custody issues at SCF in 2007, and (again) assured him he would be kept separate from Hispanic gang members while at SCF.

Although SCF staff possessed this information and had made several assurances to Plaintiff, they (again) placed him in general population with active Hispanic gang members.

On August 14, 2012, Plaintiff was assaulted by a Hispanic gang member who had been hiding in the shower on the first tier of A-pod ("Orientation"), LU-1 and had entered Plaintiff's cell "uninvited." Plaintiff went to the cell to see what was going on and was immediately assaulted. During the investigation which followed this incident, SCF Intel/STG staff interviewed Plaintiff, where he stated that (1) he had been placed in general population with active Hispanic gang members, (2) he had been housed in the Orientation pod with Hispanic gang members, (3) he had received death threats, (4) he had reported this information to housing unit staff but had been ignored, and (5) he had been targeted and assaulted by three active Hispanic gang members while at LCF in April 2007. Plaintiff told SCF staff that he feared for his safety if placed back in general population with Hispanic gang members.

On August 31, 2012, SCF staff (Johnny Crussel) noted in Plaintiff's records his having documented custody issues at SCF (names redacted). A second entry by Crussel notes a "Request for C.I." was sent to the Case Manager III (Ryan Long), a review for pending transfer and a "Reclass" completed. A final entry by Crussel however, notes Plaintiff being "OK for SCF West/Level III" general population at SCF. SCF staff (eventually) arranged Plaintiff's transfer to another CDOC facility.

On July 31, 2013, Plaintiff was again transferred to BVCC. Plaintiff was interviewed by BVCC Intel/STG and Case Management staff, where he (again) recounted his prior criminal history and his prior membership in the Chi-30s street gang. Plaintiff (again) told BVCC staff he was no longer affiliated with the Chi-30s as he had "disassociated" himself from all criminal and gang-related activities. Plaintiff also (again) told BVCC staff: (1) he had testified against a Chi-30s gang member in 1998, (2) he had been labeled a snitch by Chi-30s and Oldies 13 gang members, (3) there was a "green light" on him, and (4) he had been receiving death threats ever since. Plaintiff (again) told BVCC staff that he feared for his safety if placed in general population with Hispanic gang members. BVCC staff (again) assured Plaintiff they were aware of the facts in his record and assured him he would be kept separate from Hispanic gang members while at BVCC.

Although BVCC staff possessed this information and had made several assurances to Plaintiff, they (again) placed him in general population with active Hispanic gang members.

From July 31, 2013 to August 2, 2013, Plaintiff received multiple death threats from Hispanic gang members while housed in South Unit ("Orientation" and "STAR" Program). Plaintiff reported this information to housing unit staff but had been ignored.

On August 2, 2013, a disturbance occurred in South Unit ("STAR" Program) when Hispanic gang members attacked unit staff with fists, feet, and food trays during the breakfast meal. Phase One and Phase Two responders were called to South Unit. The disturbance occurred after South Unit ("Orientation") offenders had been released from the unit to the dining hall for breakfast. Approximately 5-10 Hispanic gang members were involved in this incident

Simultaneous to the above incident, Plaintiff entered the West Dining Hall for the breakfast meal and immediately began receiving death threats from the Hispanic gang members already there. As Plaintiff was getting his tray he noticed several of the gang members getting up from their tables and moving towards him (ignoring instructions from BVCC staff monitoring the dining

Original form provided free of Charge by CO DOC Legal Services to
Offender  Lovato                    DOC#  113134
Date  JUL 2 7 2022

hall to return to their seats) while carrying prison-made weapons capable of causing fatal injuries. At this time Plaintiff moved (peremptorily) to stop the forthcoming assault against him by attacking the nearest gang member who had threatened him. Phase One and Phase Two responders were called to the West Dining Hall even though they were already involved in responding to the diversion created by Hispanic gang members in South Unit. Approximately 10-15 Hispanic gang members were involved in this (related) incident. During the investigation which followed this incident, BVCC Intel/STG staff interviewed Plaintiff, where he stated that (1) he had been placed in general population with active Hispanic gang members, (2) he had been housed in South Unit with Hispanic gang members, (3) he had received death threats, and (4) he had reported this information to housing unit staff but had been ignored,. Plaintiff told BVCC staff that he feared for his safety if placed back in general population with Hispanic gang members.

On September 30, 2013, Plaintiff was transferred to Colorado State Penitentiary ("CSP") for placement in Administrative Segregation. Plaintiff was interviewed by CSP Intel/STG and Case Management staff, where he recounted his prior criminal history and his prior membership in the Chi-30s street gang. Plaintiff told CSP staff he was no longer affiliated with the Chi-30s as he had "disassociated" himself from all criminal and gang-related activities. Plaintiff also told CSP staff: (1) he had testified against a Chi-30s gang member in 1998, (2) he had been labeled a snitch by Chi-30s and Oldies 13 gang members, (3) there was a "green light" on him, and (4) he had been receiving death threats ever since. Plaintiff told CSP staff that he feared for his safety if placed in general population with Hispanic gang members.

CSP staff extensively interviewed Plaintiff about the gang-related incidents which had occurred at BVCC, where Hispanic gang members assaulted BVCC staff to divert their attention and their ability to respond to the pre-planned assault by Hispanic gang members carrying prison-made weapons capable of causing fatal injuries on Plaintiff which occurred in the West Dining Hall. During the interview(s) Plaintiff (again) told CSP staff: (1) he had testified against a Chi-30s gang member in 1998, (2) he had been labeled a snitch by Chi-30s and Oldies 13 gang members, (3) there was a "green light" on him, and (4) he had been receiving death threats ever since, re-stating the documented fact(s) that Hispanic gang members were trying to kill him and stressed that they even went so far as to attack BVCC staff as a diversion to draw facility responders from the planned attack on him in the West Dining Hall. Plaintiff questioned CSP Intel/STG and Case Management staff about why he had been placed in general population (orientation) to begin with, why he was (repeatedly) being placed in danger by CDOC staff at the facilities he had been to, and why nothing was being done by CDOC staff to ensure his safety and security besides meaningless assurances by CDOC staff that he would be kept separate from Hispanic gang members while in CDOC facilities. Plaintiff told CSP staff that he feared for his safety if placed in general population with Hispanic gang members. CSP staff responded by stating they were aware of the facts in his record and assured Plaintiff he would be kept separate from Hispanic gang members while at CSP.

Although CSP staff possessed this information and had made several assurances to Plaintiff, they placed him in general population with active Hispanic gang members.

On May 9, 2014, CSP staff (Harry Campbell) noted in Plaintiff's records his concerns about "prison survival" and about his safety following the incidents at BVCC. A second entry by Campbell notes Plaintiff's concerns about what happens when the "doors open up at CSP."

On January 17, 2014, CSP staff (Harry Campbell) noted in Plaintiff's records that his sister had spoken with him (Campbell) about Plaintiff being assaulted while he was at BVCC and that the assault was "in relation to" another [redacted] offender, and that this offender "always has a

Original form provided free of charge by CO DOC Legal Services to
Offender _Loveto_                                    DOC# 113134
Date _JUL 27 2022_

knife or razor on him."[4]

On April 2, 2014, CSP staff (Harry Campbell) noted in Plaintiff's records that "when he goes back to the yard the [redacted] will want to get at him for stabbing one of their associates" and "once they [identity redacted] know he would stab people that is how they will come at him in lieu of fighting him without weapons."

On May 9, 2014, CSP staff (Harry Campbell) noted in Plaintiff's that he was "concerned about his safety based on his assault at BV[CC]" and that "he is concerned about when the 'doors opens up at CSP.'"

On July 23, 2014, CSP staff (Regina Roberts) noted in Plaintiff's records that "he just wants to go back to the worker pod as he knows he is going to be hit by one of the 'Sureños'. The same entry by Roberts notes that she "gave the Offender Protective Custody Request form" and that "he states he has no-where to go where he isn't safe" and that Roberts "explained that there really isn't any place for his to go if he can't go to GP."

On August 20, 2014, CSP staff (Regina Roberts) noted in Plaintiff's records that "he does not want to stay at CSP."

On August 29, 2014, CSP staff (Regina Roberts) noted in Plaintiff's records that his sister had spoken with her (Roberts) about Plaintiff and had voiced "concerns" about his safety. The same entry by Roberts notes that on August 28, 2014, she received an e-mail from Officer Abbot in Intel regarding Plaintiff's safety."

On April 30, 2015, Plaintiff was assaulted by his co-defendant (Ruben Pasilla) – himself an active Hispanic gang member - who had been moved into the same housing pod as Plaintiff by Lt. Daniel Dent (CSP Intel) shortly after being assaulted (himself) by 'Sureños' in another housing pod.

First Responders were called. CSP Staff (Sgt. Weber) fired two 870 shotgun Burns 1401 tactical rounds at both offenders to restore order. During the investigation which followed this incident, CSP Intel/STG staff interviewed Plaintiff, where he stated that (1) he had been placed in general population with his co-defendant (Pasilla) and other active Hispanic gang members, (2) he had been housed in a CCTU with Hispanic gang members, (3) he had received death threats, and (4) he had reported this information to housing unit staff but had been ignored. Plaintiff told CSP staff that he feared for his safety if placed back in general population with Hispanic gang members.

Plaintiff also questioned CSP Intel/STG and Case Management staff about why he had been placed in CSP general population (CCTU) to begin with, why CSP Intel staff had housed him with his co-defendant despite being repeatedly assured a "keep-separate" order had been placed in his records, why he had been placed in danger by CSP Intel staff, and why nothing was being done by CSP staff to ensure his safety and security besides meaningless assurances that he would be kept separate from Hispanic gang members while in CSP. Plaintiff told CSP staff that he feared for his safety if (again) placed in general population with Hispanic gang members. CSP staff responded by stating they were aware of the facts in his record and assured Plaintiff he would be kept separate from his co-defendant (Pasilla) and other active Hispanic gang members while at CSP.

On October 6, 2015, Plaintiff was transferred to Fremont Correctional Facility ("FCF"), where he was interviewed by FCF Intel/STG and Case Management staff. During the interviews Plaintiff recounted his prior criminal history and his prior membership in the Chi-30s street gang,

---

[4] This offender was currently at CSP with Plaintiff. <u>NOTE</u>: The offenders name was redacted from CM Campbell's record entry by CDOC staff in the copy of the "CHRONLOG" furnished to Plaintiff.

Original form provided free of charge by CO DOC Legal Services to
Offender ___Loreto___ DOC# _113134_
Date _JUL 2 7 2022_

but told FCF staff he was no longer affiliated with the Chi-30s as he had previously "disassociated" himself from all criminal and gang-related activities. Plaintiff also told FCF staff: (1) he had testified against a Chi-30s gang member in 1998, (2) he had been labeled a snitch by Chi-30s and Oldies 13 gang members, (3) there was a "green light" on him, and (4) he had been receiving death threats ever since. Plaintiff told FCF staff that he feared for his safety if placed in the general population of CDOC facilities with Hispanic gang members. FCF staff assured Plaintiff they were aware of the facts in his record and assured him he would be kept separate from Hispanic gang members while at FCF.

Although FCF staff possessed this information and had made several assurances to Plaintiff, they placed him in general population with active Hispanic gang members.

On February 16, 2016, FCF staff (Joneric Cox) noted in Plaintiff's records that Plaintiff wanted Cox to "e-mail [FCF] Intel and Security staff in the chain of command regarding his claim issues." The same entry states that Cox did send the e-mail.

On March 14, 2017, Plaintiff was again transferred to SCF. Plaintiff was interviewed by SCF Intel/STG and Case Management staff, where he (again) recounted his prior criminal history and his prior membership in the Chi-30s street gang. Plaintiff (again) told SCF staff he was no longer affiliated with the Chi-30s as he had "disassociated" himself from all criminal and gang-related activities. Plaintiff also (again) told SCF staff: (1) he had testified against a Chi-30s gang member in 1998, (2) he had been labeled a snitch by Chi-30s and Oldies 13 gang members, (3) there was a "green light" on him, and (4) he had been receiving death threats ever since. Finally, Plaintiff told SCF staff of his previous problems with Hispanic gang members while in general population at SCF in April 2007. Plaintiff (again) told SCF staff that he feared for his safety if placed in general population with Hispanic gang members. SCF staff (again) assured Plaintiff they were aware of the facts in his record and his custody issues at SCF in 2007, and (again) assured him he would be kept separate from Hispanic gang members while at SCF.

Although SCF staff possessed this information and had made several assurances to Plaintiff, they (again) placed him in general population with active Hispanic gang members.

On March 14, 2017, SCF staff (Randal Norris) noted in Plaintiff's records information [redacted] regarding Plaintiff's past STG involvement and custody issues as they were reported to him by Plaintiff.

On March 17, 2017, Plaintiff was assaulted in the dining hall serving line by two Hispanic gang members who approached from behind. During the investigation which followed this incident, SCF Intel/STG staff interviewed Plaintiff, where he (again) stated that (1) he had been placed in general population with active Hispanic gang members, (2) he had (again) been housed with Hispanic gang members, (3) he had (again) received death threats, (4) he had (again) reported this information to housing unit staff but had been ignored, and (5) he had been targeted and assaulted by an active Hispanic gang members while at SCF in August 2012. Plaintiff told SCF staff that he feared for his safety if placed back in general population with Hispanic gang members.

On April 3, 2017, Plaintiff was again transferred to LCF. Plaintiff was interviewed by LCF Intel/STG and Case Management staff, where he (again) recounted his prior criminal history and his prior membership in the Chi-30s street gang. Plaintiff (again) told LCF staff he was no longer affiliated with the Chi-30s as he had "disassociated" himself from all criminal and gang-related activities. Plaintiff also (again) told LCF staff: (1) he had testified against a Chi-30s gang member in 1998, (2) he had been labeled a snitch by Chi-30s and Oldies 13 gang members, (3) there was a "green light" on him, and (4) he had been receiving death threats ever since. Finally, Plaintiff told LCF staff of his previous problems with Hispanic gang members while in general population at in

Original form provided free of Charge by CO DOC Legal Services to
Offender  Lovato                    DOC# 118134
Date  JUL 2 7 2022

2009 and 2012. Plaintiff (again) told LCF staff that he feared for his safety if placed in general population with Hispanic gang members. LCF staff (again) assured Plaintiff they were aware of the facts in his record and his custody issues at LCF in 2009, and (again) assured him he would be kept separate from Hispanic gang members while at LCF.

Although LCF staff possessed this information and had made several assurances to Plaintiff, they (again) placed him in general population with active Hispanic gang members.

On April 3, 2017, LCF staff (James Gillis) noted in Plaintiff's records custody issues with 12 offenders. In the same entry Gillis falsely reported that Plaintiff had never testified against another offender and did not have any gang issues. A second entry by Gillis states "offender was interviewed to discuss and address any previously 'validated and documented' custody issues: In the same (second) entry Gillis falsely reported that Plaintiff had no "relevant or concerning" issues, had no "issues with other offenders" and had "no co-defendants within DOC."

On December 5, 2019, Plaintiff was again transferred to CSP. Plaintiff was interviewed by CSP Intel/STG and Case Management staff, where he (again) recounted his prior criminal history and his prior membership in the Chi-30s street gang. Plaintiff (again) told CSP staff he was no longer affiliated with the Chi-30s as he had "disassociated" himself from all criminal and gang-related activities. Plaintiff also (again) told CSP staff: (1) he had testified against a Chi-30s gang member in 1998, (2) he had been labeled a snitch by Chi-30s and Oldies 13 gang members, (3) there was a "green light" on him, and (4) he had been receiving death threats ever since. Plaintiff (again) told CSP staff that he feared for his safety if placed in general population with Hispanic gang members. CSP staff (again) assured Plaintiff they were aware of the facts in his record and (again) assured him he would be kept separate from Hispanic gang members while at BVCC. Finally, Plaintiff told SCF staff of his previous problems with Hispanic gang members while in general population in April 2015.

Although CSP staff possessed this information and had made several assurances to Plaintiff, they (again) placed him in general population with active Hispanic gang members.

On February 27, 2020, Plaintiff was violently assaulted by two Hispanic gang members wielding fists, feet, and a prison-made weapon (a sock filled with bars of soap). First responders were called to the housing pod. During the investigation which followed this incident, CSP Intel/STG staff interviewed Plaintiff, where he (again) stated that (1) he had been placed in general population with active Hispanic gang members, (2) he had (again) been housed with Hispanic gang members, (3) he had (again) received death threats, (4) he had (again) reported this information to housing unit staff but had been ignored, and (5) he had been targeted and assaulted by an active Hispanic gang members while at CSP in April 2015. Plaintiff told CSP staff that he feared for his safety if placed back in general population with Hispanic gang members.

Although Plaintiff had (just) been assaulted by active Hispanic gang members, CSP staff CSP staff (again) placed him in general population with the (very) same active Hispanic gang members.

On March 5, 2020, CSP staff (Diana Travis) noted in Plaintiff's records that his mother and sister had spoken with her (Travis) about the assault on Plaintiff on February 27, 2020, and had voiced their "concerns" about his well-being. The same entry by Travis notes that Plaintiff's sister had asked about his being "moved to a more secure location" and her (Travis') response that Plaintiff "would need to complete the programs at CSP and progress." Travis did not address Plaintiff's custody issues and security needs.

Original form provided free of Charge by CO DOC Legal Services to
Offender  Lovato                    DOC# 113134
Date  JUL 27 2022

On November 24, 2020, Plaintiff was brutally assaulted by three Hispanic gang members[5] wielding prison-made weapons capable of causing fatal injuries. CSP unit staff allowed the gang members to gather in the day hall, loiter outside of Plaintiff's cell while gloving-up and readying their prison-made weapons before opening Plaintiff's cell door (which <u>was not</u> supposed to be opened) and allowed the three armed gang members to enter Plaintiff's cell. After stabbing Plaintiff repeatedly the three gang members left his cell (with large blood stains on their clothing) and walked down the stairs to the lower tier, where they began celebrating (hugging) in the middle of the day hall before being given an order to "prone out" on the floor by First Responders.

During the assault Plaintiff sustained serious and life-threatening injuries as a result of the stabbing but eventually recovered after being treated at the suffered the following injuries, including over 40 stab wounds to his hands head, face, and neck; three broken teeth; life-altering nerve damage in his left arm, the left side of his face and his neck; and the loss of rage-of-motion in his left arm and shoulder.

Due to the severity of Plaintiff's wounds, he was transported to St. Thomas Moore Hospital before being transported by ground to Penrose Main Hospital in Colorado Springs.[6] Following emergency surgery Plaintiff was placed in the Intensive Care Unit ("ICU") at Penrose, where he remained for <u>three days</u> before CSP staff ordered his release from ICU and return to CSP.

On or about November 28, 2020, Plaintiff was transferred to the CTCF Infirmary, where he was placed in the "segregated" section of the infirmary. While at CTCF Plaintiff received minimal medical care and treatment for his injuries.

On or about December 1, 2020, Plaintiff was transferred to CSP where he was taken to the medical unit. There, nurses removed the 14 staples the doctors at St. Thomas Moore had used to suture the wounds to his head prior to his being placed in the CSP segregation unit. While in segregation Plaintiff received minimal medical care and treatment for his injuries.

On December 1, 2020, CSP staff (David Lisac) noted in noted in Plaintiff's records that his mother and sister had spoken with him (Lisac) about the assault on Plaintiff on November 24, 2020. Lisac noted that he had told Plaintiff's family that "we will be looking at potential placement in protective custody and other classification options."

Between November 2020 and January 2021, Plaintiff made several requests to CSP Administrative, Intel/STG and Case Management staff (the Defendants) for grievance forms - to address CSP staff's refusal to address his validated and documented custody issues and ensure his safety and security - and assistance in filling them out. The Defendants, at one time or another during this period, refused to provide the forms and to provide assistance in filling them out – citing Plaintiff's being recommended for placement in protective custody.

On January 12, 2021, Plaintiff was transferred to the Arkansas Valley Correctional Facility ("AVCF") Protective Custody housing unit.

## CLAIM ONE: THAT DEFENDANT THOMAS LITTLE WAS DELIBERATELY

---

[5] One of the gang members was a relative of the victim in Plaintiff's November 1998 high-profile, gang-related shooting in Denver, Colorado. This information had previously been provided to Intel/STG and Case Management staff at every CDOC facility Plaintiff had been transferred to.

[6] Plaintiff was stabilized at St. Thomas Moore and his less severe injuries were treated before doctors there requested he be transferred via Flight-for-Life to Colorado Springs. Heavy rain and severely reduced visibility (however) caused Plaintiff to be transferred via ambulance to Penrose Main Hospital.

Original form provided free of Charge by CO DOC Legal Services to Offender  Lovato          DOC# 113134
Date JUL 27 2022

**INDIFFERENT TO PLAINTIFF'S CUSTODY ISSUES AND FAILED TO KEEP HIM FROM SERIOUS HARM AT THE HANDS OF OTHER PRISONERS IN VIOLATION OF THE CRUEL AND UNUSUAL PUNISHMENT CLAUSE OF THE EIGHTH AMENDMENT TO THE UNITED STATES CONSTITUTION.**

<u>Supporting facts</u>: From December 5, 2019 to November 24, 2020, Defendant Thomas Little ("LITTLE") willfully and wantonly refused to act reasonably in response to (1) death threats made against Plaintiff, (2) documented custody issues, (3) his designation as a witness against his co-defendant in a murder trial, and (4) the snitch label he acquired by testifying against his co-defendant which demonstrated the existence of a substantial risk of serious harm and/or severe injury, as Plaintiff was considered a trophy kill[,]"thus making him particularly vulnerable in general population at CSP or any other CDOC facility as the gangs who have targeted Plaintiff will not let these issues go.

Defendant Little willfully and wantonly engaged in conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community when he willfully and wantonly displayed a reckless disregard and deliberate indifference to Plaintiff's safety by refusing to act reasonably in response to death threats made against Plaintiff; as well as his documented custody issues, the snitch label he acquired by testifying against his co-defendant, and by placing Plaintiff in the CSP general population in situations intended to create a substantial risk of serious harm and/or severe injury. <u>Gray v. Little</u>, 2021 U.S. Dist. LEXIS 137405 (July 23, 2021) (citing <u>Farmer v. Brennan</u>, 511 U.S. 825, 832, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994).

Defendant Little supervised and controlled Defendants David Lisac ("LISAC"), John/Jane Doe #1 ("DOE #1"), Daniel Dent ("DENT"), [?] White ("WHITE"), James Johnson ("JOHNSON"), Larry Weingardner ("WEINGARDNER"), Diana Travis ("TRAVIS"), Haley Hanson ("HANSON"), Jackie Schaal ("SCHAAL"), John/Jane Doe #2 ("DOE #2) and John/Jane Doe #3 ("DOE #3) and the collection of information and records regarding Plaintiff's documented custody issues. Defendant Little's job was made easier by the fact that he had direct access to all relevant CDOC policies which mandate a "zero-tolerance" for all gang-related activities within the department's facilities as well as direct access to Plaintiff's inmate file(s) which contained (1) a letter from the Denver County District Attorney's office outlining Plaintiff's participation as a witness in a high-profile murder case against a known member of the Ci-30's gang; (2) the snitch label Plaintiff had acquired as a direct result of that testimony; (3) information that Plaintiff had "dropped-out" of all gang-related/criminal activities with any street gang(s)[7]; (4) information regarding death threats made against Plaintiff and his family by known members of the Chi-30s, Oldies-13s gangs[8]; (5) records documented assaults suffered by Plaintiff at the hands of known Oldies-13s members while in the SCF general population; (6) records documented assaults suffered by Plaintiff at the hands of known Chi-30s members while in the LCF general population; (7) records documented assaults suffered by Plaintiff at the hands of known Oldies-13s and Sureños-13s members while in the BVCC general population; (8) records documented assaults

---

[7] In Plaintiff's own words, he declares himself a non-associate with any/all street gangs and has removed himself from that criminal lifestyle.

[8] All of these gangs are "STG" security threat/terrorist groups which are well-documented by the Colorado Department of Corrections ("CDOC") and which are active in most of the CDOC facilities in the state, including the Colorado State Penitentiary.

22
Original form provided free of Charge by CO DOC Legal Services to
Offender  Lovato                              DOC# 113134
Date  JUL 27 2022

suffered by Plaintiff at the hands of known Oldies-13s and Sureños-13s members while in the CSP general population; (9) that Plaintiff had/has received "death threat" letters from known members of the Chi-3Qs and Oldies-13s gangs, (10) there exists "strong lines of communication" between Hispanic gang members in all of CDOC's facilities, (11) that a "green light" had been given by known members of Hispanic prison gangs in CDOC facilities due to prison/racial politics to "kill" Plaintiff; and (12) records documented that Plaintiff had/has brought his concerns regarding his safety and security to the attention of several CSP staff.

Defendant Little personally supervised, through his appointed subordinates and the collection and review of the information and records regarding the death threats made against Plaintiff, his documented custody issues, and the snitch label he acquired by testifying against his co-defendant. Defendant Little was therefore required to act to protect Plaintiff from a substantial risk of serious harm and/or severe injury at the hands of active [rival] gang members at CSP. *Farmer*, 511 U.S., at 833.

Defendant Little was responsible for the acts and omissions of Defendants Lisac, Doe #1, Dent, White, Johnson, Weingardner, Travis, Hanson, Schaal, Doe #2, and Doe #3 due to his personal knowledge of same. *Cf. Howard v. Wilkerson*, 768 F. Supp. 1002, 1009 (1991) (A supervisory official may be liable if, after learning of the violation through an appeal, the official failed to remedy the wrong or allowed a policy or custom under which unconstitutional practices occurred to continue); *see also Edwards v. Zavaras*, 2001 U.S. Dist. LEXIS 155877 (October 19, 2011) (In situations where an "affirmative link" exists between the constitutional deprivation and either the supervisor's personal participation, his exercise of control or direction, or his failure to supervise, the supervisor may be personally liable); *Schneider v. City of Grand Junction Police Dep't.*, 717 F.3d 760, 767-69 (10th Cir. 2013) (Discussing standards of supervisory liability).

Defendant Little failed to remedy the acts and omissions of Defendants Lisac, Doe #1, Dent, White, Johnson, Weingardner, Travis, Hanson, Schaal, Doe #2, and Doe #3 by refusing to address the issues made known to him through normal internal [staff] processes, intra-facility "kites" sent to him by Plaintiff, and through phone calls made by members of Plaintiffs' family and friends directly to CSP staff. *See Laratta v. Zavaras*, 2010 U.S. Dist. LEXIS 102319 (June 14, 2010) (citing *Williams v. Smith*, 781 F.2d 319 (2nd Cir. 1986) (A supervisory official may be personally liable if he or she was grossly negligent in managing subordinates who caused the unlawful condition or event) and *U.S. ex rel. Larkins v. Oswald*, 510 F.2d 583, 589 (2nd Cir. 1975) (A supervisory official, after learning of the violation through a report or appeal, may have failed to remedy the wrong).

An affirmative link exists between the constitutional deprivations claimed by Plaintiff and by Defendant Little's personal participation, his failure to exercise control or direction and his failure to supervise Defendants Lisac, Doe #1, Dent, White, Johnson, Weingardner, Travis, Hanson, Schaal, Doe #2, and Doe #3. *See Sanaah v. Howell*, 384 Fed. Appx. 737, 2010 U.S. App., LEXIS 13038 (10th Cir. 2010); *see also Green v. Branson*, 108 F.3d 1296, 1302 (10th Cir. 1997) (citing *Meade v. Grubbs*, 841 F.2d 1512, 1527 (10th Cir. 1988). Further, Defendant Little promulgated, created, implemented and possessed responsibility for the continued operation of policies which caused Plaintiff to be repeatedly placed in the CSP general population in situations intended to create a substantial risk of serious harm or severe injury when he knew or should have known of the death threats made against Plaintiff, his documented custody issues and the snitch label he acquired by testifying against his co-defendant. *Cf. Dodds v. Richardson*, 614 F.3d 1185, 1196 (10th Cir. 20102) (quoting *Jenkins v. Wood*, 81 F.3d 988, 995 (10th Cir. 1996) (A plaintiff may satisfy the requirements for imposing supervisory liability under § 1983 by "showing the

Original form provided free of Charge by CO DOC Legal Services to
Offender ___Lovato___    DOC# 113134
Date ___JUL 27 2022___

defendant-supervisor personally directed the violation or had actual knowledge of the violation and acquiesced in its continuance"); *see also Espinoza v. Raemisch*, 2019 U.S. Dist. LEXIS 56504 (10th Cir. 2019), *Northington v. Jackson*, 973 F.2d 1518 (10th Cir. 1992).

Defendant Little knew or should have known of the danger associated with the death threats made against Plaintiff, his documented custody issues and the snitch label, and should have taken reasonable steps to protect him from serious harm or severe injury by (1) recommending Plaintiff (himself) request voluntary placement in protective custody or (2) initiating or requesting review for involuntary placement in protective custody. *Cf. Gray v. Little*, 2021 U.S. Dist. LEXIS 137405 (July 23, 2021) (citing *Benefield v. McDowall*, 241 F.3d 1267 (10th Cir. 2001). Defendant Little had the ability/authority under department policy to remove Plaintiff from the general population and to initiate or request an involuntary review for protective custody placement based upon the information and facts known to him and the information contained in Plaintiff's records. *Id.* [9]

Defendant Little knew of and disregarded the substantial risk(s) to Plaintiff's safety, *Farmer, supra* and *Howard, supra,* and willfully and wantonly placed him, or allowed him to be placed, in the CSP general population in situations intended to create a risk of serious harm or severe injury. *Northington, supra.*

Defendant Little knew or should have known that placing Plaintiff in the CSP general population would create [and in fact did create] a substantial risk of serious harm or severe injury to Plaintiff. Defendant Little had direct knowledge of that present and substantial risk and refused to act reasonably to protect Plaintiff.

Defendant Little was [therefore] deliberately indifferent to Plaintiff's documented need for protection and through his willful and wanton acts and omissions allowed Plaintiff to be housed in the CSP general population under conditions posing a present and substantial risk of serious harm or severe injury at the hands of known [rival] gang members. *Farmer*, 511 U.S., at 833.

**CLAIM TWO: THAT DEFENDANTS DAVID LISAC, JOHN/JANE DOE #1, DANIEL DENT, [?] WHITE, AND JAMES JOHNSON WERE DELIBERATELY INDIFFERENT TO PLAINTIFF'S CUSTODY ISSUES AND FAILED TO KEEP HIM FROM SERIOUS HARM AT THE HANDS OF OTHER PRISONERS IN VIOLATION OF THE CRUEL AND UNUSUAL PUNISHMENT CLAUSE OF THE EIGHTH AMENDMENT TO THE UNITED STATES CONSTITUTION.**

Supporting facts: From December 5, 2019 to November 24, 2020, Defendants David Lisac ("LISAC"), John/Jane Doe #1 ("DOE #1"), Daniel Dent ("DENT"), [?] White ("WHITE"), and James Johnson ("JOHNSON") willfully and wantonly refused to act reasonably in response to (1) death threats made against Plaintiff, (2) documented custody issues, (3) his designation as a witness against his co-defendant in a murder trial, and (4) the snitch label he acquired by testifying against his co-defendant which demonstrated the existence of a substantial risk of serious harm and/or severe injury, as Plaintiff was considered a trophy kill[,] thus making him particularly vulnerable in general population at CSP or any other CDOC facility as the gangs who have targeted Plaintiff will not let these issues go.

Defendants Lisac, Doe #1, Dent, White, and Johnson willfully and wantonly engaged in conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds

---

[9] Under relevant CDOC policy, facility staff may initiate or request a review for protective custody status placement if they have information of a legitimate verifiable threat to an offender, by following the same steps as identified for offender requests for protective custody.

Original form provided free of Charge by CO DOC Legal Services to
Offender _Lovato_____  DOC# 113134____
Date _JUL 27 2022_____

of decency and to be regarded as atrocious and utterly intolerable in a civilized community when they willfully and wantonly displayed a reckless disregard and deliberate indifference to Plaintiff's safety by refusing to act reasonably in response to death threats made against Plaintiff; as well as his documented custody issues, the snitch label he acquired by testifying against his co-defendant, and by placing Plaintiff in the CSP general population in situations intended to create a substantial risk of serious harm and/or severe injury. *Gray v. Little*, 2021 U.S. Dist. LEXIS 137405 (July 23, 2021) (citing *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994)).

Defendants Lisac, Doe #1, Dent, White, Johnson, and Lusk were each personally responsible for maintaining and updating Plaintiff's inmate and Intel records on STG issues, for validating and verifying Plaintiff's custody issues, for maintaining and updating inmate and Intel records on inmates who had actively inflicted or threatened to inflict harm to Plaintiff, and for taking all reasonable measures necessary to confine, separate or transfer inmate(s) who had inflicted or threatened to inflict harm to Plaintiff.

Defendants Lisac, Doe #1, Dent, White, and Johnson's job(s) were made easier by the fact that they had direct access to all relevant CDOC policies which mandate a "zero-tolerance" for all gang-related activities within the department's facilities as well as direct access to Plaintiff's inmate file(s) which contained (1) a letter from the Denver County District Attorney's office outlining Plaintiff's participation as a witness in a high-profile murder case against a known member of the Ci-30's gang; (2) the snitch label Plaintiff had acquired as a direct result of that testimony; (3) information that Plaintiff had "dropped-out" of all gang-related/criminal activities with any street gang(s)[10]; (4) information regarding death threats made against Plaintiff and his family by known members of the Chi-30s, Oldies-13s gangs[11]; (5) records documented assaults suffered by Plaintiff at the hands of known Oldies-13s members while in the SCF general population; (6) records documented assaults suffered by Plaintiff at the hands of known Chi-30s members while in the LCF general population; (7) records documented assaults suffered by Plaintiff at the hands of known Oldies-13s and Sureños-13s members while in the BVCC general population; (8) records documented assaults suffered by Plaintiff at the hands of known Oldies-13s and Sureños-13s members while in the CSP general population; (9) that Plaintiff had/has received "death threat" letters from known members of the Chi-30s and Oldies-13s gangs, (10) there exists "strong lines of communication" between Hispanic gang members in all of CDOC's facilities, (11) that a "green light" had been given by known members of Hispanic prison gangs in CDOC facilities due to prison/racial politics to "kill" Plaintiff; and (12) records documented that Plaintiff had/has brought his concerns regarding his safety and security to the attention of several CSP staff.

Defendants Lisac, Doe #1, Dent, White, and Johnson each personally participated in investigating, verifying and validating Plaintiff's custody issues and were required [individually and severally] to report their findings to Defendant Little per CDOC policy to protect Plaintiff from risk of serious harm or severe injury at the hands of known [rival] gang member at CSP. *Farmer*, 511 U.S., at 833. Therefore, Defendants Lisac, Doe #1, Dent, White, and Johnson knew or should have known that a substantial risk of serious harm or severe injury to Plaintiff existed,

---

[10] In Plaintiff's own words, he declares himself a non-associate with any/all street gangs and has removed himself from that criminal lifestyle.

[11] All of these gangs are "STG" security threat/terrorist groups which are well-documented by the Colorado Department of Corrections ("CDOC") and which are active in most of the CDOC facilities in the state, including the Colorado State Penitentiary.

Original form provided free of Charge by CO DOC Legal Services to
Offender  Lorato                      DOC# 113134
Date  JUL 27 2022

should each be presumed to have inferred that a substantial risk of serious harm or severe injury to Plaintiff existed, and that their failure to protect Plaintiff could result in serious harm or severe injury to him. _Wilson v. Falk_, 877 F.3d 1204, 1209 (10th Cir. 2017) (citing _Howard v. Waide_, 534 F.3d 1227, 1236 (10th Cir. 2008).

Defendants Lisac, Doe #1, Dent, White, and Johnson knew or should have known of the danger associated with the death threats made against Plaintiff, his documented custody issues and the snitch label, and should have taken reasonable steps to protect him from serious harm or severe injury by (1) recommending Plaintiff (himself) request voluntary placement in protective custody or (2) initiating or requesting review for involuntary placement in protective custody. _Cf. Gray v. Little_, 2021 U.S. Dist. LEXIS 137405 (July 23, 2021) (citing _Benefield v. McDowall_, 241 F.3d 1267 (10th Cir. 2001). Defendants Lisac, Doe #1, Dent, White, and Johnson had the ability/authority under department policy to remove Plaintiff from the general population and to initiate or request an involuntary review for protective custody placement based upon the information and facts known to him and the information contained in Plaintiff's records. _Id_.

Defendants Lisac, Doe #1, Dent, White, and Johnson had the responsibility to explain to Plaintiff that he could provide information (claims and written statements) on custody issues to be verified and validated by CDOC and facility staff. Additionally, Defendants Lisac, Doe #1, Dent, White, and Johnson had the ability/authority under department policy to remove Plaintiff from general population and to initiate or request an involuntary review for protective custody placement based upon information and facts known to them and on the information contained in Plaintiff's records. _Id_.

Defendants Lisac, Doe #1, Dent, White, and Johnson knew of and disregarded the substantial risk(s) to Plaintiff's safety, _Farmer, supra_ and _Howard, supra_, and willfully and wantonly placed him in the CSP general population in situations intended to create a risk of serious harm and/or severe injury. _Northington, supra_. Defendants Lisac, Doe #1, Dent, White, and Johnson's conduct was beyond reckless and was clearly malicious with the intent to cause Plaintiff physical, emotional and psychological harm.

Defendants Lisac, Doe #1, Dent, White, and Johnson knew, or should have known, that placing Plaintiff in the CSP general population would create (and in fact, did create) a substantial risk of serious harm and/or severe injury to Plaintiff, had knowledge of that present and substantial risk and failed to act reasonably to protect Plaintiff.

Defendants Lisac, Doe #1, Dent, White, and Johnson were therefore deliberately indifferent to Plaintiff's documented need for protection and through their willful and wanton acts and omissions allowed Plaintiff to be housed in the CSP general population under conditions posing a present and substantial risk of serious harm and/or severe injury at the hands of active [rival] gang members. _Farmer_, 511 U.S., at 833.

## CLAIM THREE: THAT DEFENDANTS LARRY WEINGARDNER, DIANA TRAVIS AND HALEY HANSON WERE DELIBERATELY INDIFFERENT TO PLAINTIFF'S CUSTODY ISSUES AND FAILED/REFUSED TO KEEP HIM FROM HARM AT THE HANDS OF OTHER PRISONERS IN VIOLATION OF THE CRUEL AND UNUSUAL PUNISHMENT CLAUSE OF THE EIGHTH AMENDMENT TO THE UNITED STATES CONSTITUTION.

Supporting facts: From December 5, 2019 to November 24, 2020, Defendants Larry Weingardner ("WEINGARDNER"), Diana Travis ("TRAVIS") and Haley Hanson ("HANSON") willfully and wantonly refused to act reasonably in response to (1) death threats made against

Original form provided free of Charge by CO DOC Legal Services to
Offender ___Lovato___ DOC# _11313 4_
Date ___JUL 2 7 2022___

Plaintiff, (2) documented custody issues, (3) his designation as a witness against his co-defendant in a murder trial, and (4) the snitch label he acquired by testifying against his co-defendant which demonstrated the existence of a substantial risk of serious harm and/or severe injury, as Plaintiff was considered a trophy kill[,]"thus making him particularly vulnerable in general population at CSP or any other CDOC facility as the gangs who have targeted Plaintiff will not let these issues go.

Defendants Weingardner, Travis and Hanson willfully and wantonly engaged in conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community when they willfully and wantonly displayed a reckless disregard and deliberate indifference to Plaintiff's safety by refusing to act reasonably in response to the death threats made against Plaintiff, as well as his documented custody issues and the snitch label he acquired by testifying against his co-defendant, and by placing Plaintiff in the CSP general population and in situations intended to create a risk of serious harm and/or severe injury. _Gray v. Little_, 2021 U.S. Dist. LEXIS 137405 (July 23, 2021) (citing _Farmer v. Brennan_, 511 U.S. 825, 832, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994).

Defendants Weingardner, Travis and Hanson were each personally responsible for maintaining and updating Plaintiff's case management records on STG issues, for maintaining and updating case management records on inmates who had actively inflicted or threatened to inflict harm to Plaintiff; and for taking all reasonable measures necessary to confine, separate or transfer inmate(s) who had inflicted or threatened to inflict harm to Plaintiff.

Defendants Weingardner, Travis and Hanson's job(s) were made easier by the fact that they had direct access to all relevant CDOC policies which mandate a "zero-tolerance" for all gang-related activities within the department's facilities, as well as direct access to Plaintiff's inmate file(s) which contained (1) a letter from the Denver County District Attorney's office outlining Plaintiff's participation as a witness in a high-profile murder case against a known member of the Ci-30's gang; (2) the snitch label Plaintiff had acquired as a direct result of that testimony; (3) information that Plaintiff had "dropped-out" of all gang-related/criminal activities with any street gang(s); (4) information regarding death threats made against Plaintiff and his family by known members of the Chi-30s, Oldies-13s gangs; (5) records documented assaults suffered by Plaintiff at the hands of known Oldies-13s members while in the general population at the SCF; (6) records documented assaults suffered by Plaintiff at the hands of known Chi-30s members while in the general population at the LCF; (7) records documented assaults suffered by Plaintiff at the hands of known Oldies-13s and Sureños-13s members while in the general population at the BVCC; (8) records documented assaults suffered by Plaintiff at the hands of known Oldies-13s and Sureños-13s members while in the general population at the CSP; (9) that Plaintiff had/has received "death threat" letters from known members of the Chi-30s and Oldies-13s gangs, (10) there existed "strong lines of communication" between Hispanic gang members in the department's facilities, (11) that a "green light" had been given by known members of Hispanic prison gangs in Colorado due to prison/racial politics to "kill" Plaintiff; and (12) records documented that Plaintiff had/has brought his concerns regarding his safety and security to the attention of several CSP staff.

Defendants Weingardner, Travis and Hanson each personally maintained and updated Plaintiff's case management records on STG issues, maintained and updated case management records on inmates who had actively inflicted or threatened to inflict harm to Plaintiff; and for taking all reasonable measures necessary to confine, separate or transfer inmate(s) who had inflicted or threatened to inflict harm to Plaintiff, as well as personally participating in documenting Plaintiff's custody issues and were required (individually and severally) to report

Original form provided free of charge by CO DOC Legal Services to
Offender ___Lovato___ DOC# _113134_
Date ___JUL 27 2022___

their findings to Defendants Little, Lisac, Doe #1, Dent, White, and Johnson per CDOC policy to protect Plaintiff from risk of serious harm and/or severe injury at the hands of active [rival] gang members at CSP. *Farmer*, 511 U.S., at 833. Therefore, Defendants Weingardner, Travis and Hanson knew or should have known that a substantial risk of serious harm and/or severe injury to Plaintiff existed, should each be presumed to have inferred that a substantial risk of serious harm and/or severe injury to Plaintiff existed, and that their failure to protect Plaintiff could result in serious harm and/or severe injury to him. *Wilson v. Falk*, 877 F.3d 1204, 1209 (10th Cir. 2017) (citing *Howard v. Waide*, 534 F.3d 1227, 1236 (10th Cir. 2008).

Defendants Weingardner, Travis and Hanson knew or should have known of the danger associated with the death threats made against Plaintiff, as well as his documented custody issues and the snitch label he acquired by testifying against his co-defendant and should have taken reasonable steps to protect him from serious harm and/or severe injury by (1) recommending Plaintiff (himself) request voluntary placement in protective custody or (2) initiating or requesting review for involuntary placement in protective custody. *Cf. Gray v. Little*, 2021 U.S. Dist. LEXIS 137405 (July 23, 2021) (citing *Benefield v. McDowall*, 241 F.3d 1267 (10th Cir. 2001).

Defendants Weingardner, Travis and Hanson had the responsibility to explain to Plaintiff that he could provide information (claims and written statements) on custody issues to be verified and validated by CDOC and facility staff. Additionally, Defendants Weingardner, Travis and Hanson had the ability/authority under department policy to remove Plaintiff from the general population and to initiate or request an involuntary review for protective custody placement based upon information and facts known to them and on the information contained in Plaintiff's records. *Id*.

Defendants Weingardner, Travis and Hanson knew of and disregarded the substantial risk(s) to Plaintiff's safety, *Farmer, supra* and *Howard, supra*, and willfully and wantonly placed him in the CSP general population in situations intended to create a risk of serious harm and/or severe injury. *Northington, supra*.

Defendants Weingardner, Travis and Hanson knew, or should have known, that placing Plaintiff in the CSP general population would create (and in fact, did create) a substantial risk of serious harm and/or severe injury to Plaintiff, had knowledge of that present and substantial risk, and refused to act reasonably to protect Plaintiff.

Defendants Weingardner, Travis and Hanson were therefore deliberately indifferent to Plaintiff's documented need for protection and, through their willful and wanton acts and omissions, allowed Plaintiff to be housed in the general population under conditions posing a present and substantial risk of serious harm and/or severe injury at the hands of active [rival] gang members at CSP. *Farmer*, 511 U.S., at 833.

**CLAIM FOUR: THAT DEFENDANT JACKIE SCHAAL WAS DELIBERATELY INDIFFERENT TO PLAINTIFF'S CUSTODY ISSUES AND FAILED TO KEEP HIM FROM HARM AT THE HANDS OF OTHER PRISONERS IN VIOLATION OF THE CRUEL AND UNUSUAL PUNISHMENT CLAUSE OF THE EIGHTH AMENDMENT TO THE UNITED STATES CONSTITUTION.**

Supporting facts: On November 24, 2020, Defendant Jackie Schaal ("SCHAAL") willfully and wantonly refused to act reasonably in response to (1) death threats made against Plaintiff, (2) documented custody issues, (3) his designation as a witness against his co-defendant in a murder trial, and (4) the snitch label he acquired by testifying against his co-defendant which demonstrated

Original form provided free of Charge by CO DOC Legal Services to
Offender _Lovato_
DOC# _113134_
Date _JUL 27 2022_

the existence of a substantial risk of serious harm and/or severe injury, as Plaintiff was considered a trophy kill[,]"thus making him particularly vulnerable in general population at CSP or any other CDOC facility as the gangs who have targeted Plaintiff will not let these issues go.

Defendants Schaal willfully and wantonly engaged in conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community when they willfully and wantonly displayed a reckless disregard and deliberate indifference to Plaintiff's safety by refusing to act reasonably in response to Plaintiff's custody issues and snitch label and by allowing three known prison gang members to loiter outside of Plaintiff's cell door while wearing gloves and wielding prison-made weapons capable of causing fatal injuries, and then opening Plaintiff's cell door to allow entry into his cell (enabling the assault against Plaintiff) in violation of well-established CDOC and CSP policy, thereby creating a situation which enabled Plaintiff to be stabbed numerous times (inflicting serious harm and/or severe injury). _Gray v. Little_, 2021 U.S. Dist. LEXIS 137405 (July 23, 2021) (citing _Farmer v. Brennan_, 511 U.S. 825, 832, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994).

Defendant Schaal had the responsibility to explain to Plaintiff that he could provide information (claims and written statements) on custody issues to be verified and validated by CCDOC and facility staff. Additionally, Defendant Schaal had the ability/authority under department policy to remove Plaintiff from the general population and to initiate or request an involuntary review for protective custody placement based upon information and facts known to him and on the information contained in Plaintiff's records.

The acts of CSP unit staff were in direct violation of several departmental and facility policies (not to mention the keep-separate orders Plaintiff had been informed had been entered since May, 2002 in response to Plaintiff's numerous documented custody issues).

**CLAIM FIVE: THAT DEFENDANTS JOHN/JANE DOE #2 AND JOHN/JANE DOE #3 WERE DELIBERATELY INDIFFERENT TO PLAINTIFF'S CUSTODY ISSUES AND FAILED TO KEEP HIM FROM HARM AT THE HANDS OF OTHER PRISONERS IN VIOLATION OF THE CRUEL AND UNUSUAL PUNISHMENT CLAUSE OF THE EIGHTH AMENDMENT TO THE UNITED STATES CONSTITUTION.**

Supporting facts: On November 24, 2020, Defendants John/Jane Doe #2 ("DOE #2) and John/Jane Doe #3 ("DOE #3) willfully and wantonly refused to act reasonably in response to (1) death threats made against Plaintiff, (2) documented custody issues, (3) his designation as a witness against his co-defendant in a murder trial, and (4) the snitch label he acquired by testifying against his co-defendant which demonstrated the existence of a substantial risk of serious harm and/or severe injury, as Plaintiff was considered a trophy kill[,]"thus making him particularly vulnerable in general population at CSP or any other CDOC facility as the gangs who have targeted Plaintiff will not let these issues go.

willfully and wantonly engaged in conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and to be regarded as atrocious, reprehensible and utterly intolerable in a civilized community and which would be illegal in all states because it violated the U. S. Constitution, as his conduct was intentional, and as a prisoner Plaintiff presented

Original form provided free of Charge by CO DOC Legal Services to
Offender  Lovato                    DOC# 113134
Date  JUL 27 2022

a "vulnerable target." Defendant Lusk willfully and wantonly displayed a reckless disregard and deliberate indifference to Plaintiff's safety by refusing to act reasonably in response to documented custody issues and by placing Plaintiff in CSP general population in situations intended to create a risk of serious harm and/or severe injury.

Defendants Doe #2 and Doe #3 willfully and wantonly engaged in conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community when they willfully and wantonly displayed a reckless disregard and deliberate indifference to Plaintiff's safety by refusing to act reasonably in response to Plaintiff's custody issues and snitch label and by allowing three known gang members to loiter outside Plaintiff's cell door while wearing gloves and brandishing prison-made weapons capable of causing fatal injuries, and opening Plaintiff's cell door to allow entry into his cell (enabling the assault against Plaintiff) in violation of CDOC and CSP policy, thereby creating a situation which contributed to Plaintiff's being stabbed 41 times. *Gray v. Little*, 2021 U.S. Dist. LEXIS 137405 (July 23, 2021) (citing *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994)). Defendants Doe #2 and Doe #3's conduct was beyond reckless and was clearly malicious with the intent to cause physical, emotional and psychological harm to the Plaintiff.

Defendants Doe #2, and Doe #3 had the ability/authority under CDOC policy to remove Plaintiff from the general population and to initiate or request an involuntary review for protective custody placement based upon information and facts known to them and the information contained in Plaintiff's records.

Defendants Doe #2 and Doe #3 were each personally responsible for the safety and security of inmate(s) in the housing unit, for monitoring the security and status of the unit in which Plaintiff was housed (including ensuring that all cell doors were secured, that offenders do not loiter in front of cells while in the day-hall during recreation), for reporting Plaintiff's custody issues to , for maintaining and updating inmate and Intel records on inmates who had actively inflicted or threatened to inflict harm to Plaintiff; and for taking all reasonable measures necessary to confine, separate or transfer inmate(s) who had inflicted or threatened to inflict harm to Plaintiff.

for ensuring that housing unit and cell doors are secured at all times; for ensuring that inmates are secured within their cells when not on authorized or scheduled movement(s); for ensuring the separation of inmate(s) in the housing unit with Security Threat/Terrorist Group ("STG") issues from other inmate(s) who actively participate in disruptive and/or threatening STG behavior; for reporting inmate(s) in the housing unit with STG issues to the Unit Lieutenant, the Shift Commander, the facility Intel/STG unit, the Custody Control/Security Major, and all other relevant facility staff; for maintaining and updating chronological records on inmate(s) in the housing unit who actively inflict or threaten to inflict harm to others; for maintaining and updating chronological records on inmate(s) in the housing unit who actively participate in disruptive and/or threatening STG behavior or who inflict or threaten to inflict harm to other inmates; for taking all reasonable measures necessary to confine, and/or separate inmate(s) in the housing unit who actively participate in disruptive and/or threatening STG behavior or who inflict or threaten to inflict harm to the employees, contract workers, volunteers, and other inmates within the facility.

The acts of CSP unit staff were in direct violation of several departmental and facility policies (not to mention the keep-separate orders Plaintiff had been informed had been entered since May, 2002 in response to Plaintiff's numerous documented custody issues).

30

Original form provided free of charge by CO DOC Legal Services to
Offender ___Loveto___    DOC# 113134
Date JUL 2 7 2022

As a direct result of Defendant's outrageous conduct…Plaintiff suffered permanent disfigurement and scarring of the face, head and neck, permanent nerve damage in his jaw and neck, permanent loss of range-of-motion in his neck, left shoulder and left upper arm, agonizing and chronic back, neck and shoulder (left) pain, debilitating mental and physical injuries, emotional distress,

**CLAIM SIX: THAT DEFENDANT JAY LUSK WAS DELIBERATELY INDIFFERENT TO PLAINTIFF'S CUSTODY ISSUES AND FAILED TO KEEP HIM FROM SERIOUS HARM AT THE HANDS OF OTHER PRISONERS IN VIOLATION OF THE CRUEL AND UNUSUAL PUNISHMENT CLAUSE OF THE EIGHTH AMENDMENT TO THE UNITED STATES CONSTITUTION.**

Supporting facts: From December 5, 2019 to November 24, 2020, Defendant Jay Lusk ("LUSK") willfully and wantonly refused to act reasonably in response to (1) death threats made against Plaintiff, (2) documented custody issues, (3) his designation as a witness against his co-defendant in a murder trial, and (4) the snitch label he acquired by testifying against his co-defendant which demonstrated the existence of a substantial risk of serious harm and/or severe injury, as Plaintiff was considered a trophy kill[,]"thus making him particularly vulnerable in general population at CSP or any other CDOC facility as the gangs who have targeted Plaintiff will not let these issues go.

Defendant Lusk willfully and wantonly engaged in conduct so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and to be regarded as atrocious, reprehensible and utterly intolerable in a civilized community and which would be illegal in all states because it violated the U. S. Constitution, as his conduct was intentional, and as a prisoner Plaintiff presented a "vulnerable target." Defendant Lusk willfully and wantonly displayed a reckless disregard and deliberate indifference to Plaintiff's safety by refusing to act reasonably in response to documented custody issues and by placing Plaintiff in CSP general population in situations intended to create a risk of serious harm and/or severe injury. *Gray v. Little*, 2021 U.S. Dist. LEXIS 137405 (July 23, 2021) (citing *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994)). Defendant Lusk's conduct was beyond reckless and was clearly malicious with the intent to cause physical, emotional and psychological harm to the Plaintiff.

Defendant Lusk had the responsibility to investigate Plaintiff's custody issues; both those from all of the other CDOC facilities Plaintiff had been to as well as those at CSP.

Defendant Lusk was personally responsible for (1) maintaining and updating Plaintiff's inmate and Intel/OIG records on STG issues, (2) investigating Plaintiff's custody issues, (3) validating and verifying Plaintiff's custody issues, (4) maintaining and updating Plaintiff's inmate and Intel/OIG records, (5) maintaining and updating inmate and Intel records on inmates who had actively inflicted or threatened to inflict harm to Plaintiff; and (6) for taking all reasonable measures necessary to confine, separate or transfer inmate(s) who had inflicted or threatened to inflict harm to Plaintiff.

Defendant Lusk's job was made easier by the fact that he had direct access to all relevant CDOC policies which mandate a "zero-tolerance" for all gang-related activities within the departments' facilities, as well as direct access to Plaintiff's inmate file(s) which contained: (1) a letter from the Denver County District Attorney's office outlining Plaintiff's participation as a witness in a high-profile murder case against a known member of the Ci-30's gang; (2) the snitch label Plaintiff had acquired as a direct result of that testimony; (3) information that Plaintiff had "dropped-out" of all gang-related/criminal activities with any street gang(s); (4) information

Original form provided free of Charge by CO DOC Legal Services to
Offender  Lovato                          DOC# 113134
Date  JUL 2 7 2022

regarding death threats made against Plaintiff and his family by known members of the Chi-30s, Oldies-13s gangs; (5) records documented assaults suffered by Plaintiff at the hands of known Oldies-13s members while in the general population at the SCF; (6) records documented assaults suffered by Plaintiff at the hands of known Chi-30s members while in the general population at the LCF; (7) records documented assaults suffered by Plaintiff at the hands of known Oldies-13s and Sureños-13s members while in the general population at the BVCC; (8) records documented assaults suffered by Plaintiff at the hands of known Oldies-13s and Sureños-13s members while in the general population at the CSP; (9) that Plaintiff had/has received "death threat" letters from known members of the Chi-30s and Oldies-13s gangs, (10) there existed "strong lines of communication" between Hispanic gang members in the department's facilities, (11) that a "green light" had been given by known members of Hispanic prison gangs in Colorado due to prison/racial politics to "kill" Plaintiff; and (12) records documented that Plaintiff had/has brought his concerns regarding his safety and security to the attention of several CSP staff.

Defendant Lusk personally participated in investigating, verifying, and validating Plaintiff's custody issues and was required to report his findings to the Inspector General of the CDOC and to Defendant Little per CDOC policy to protect Plaintiff from risk of serious harm or severe injury at the hands of active [rival] gang member at CSP. *Farmer*, 511 U.S., at 833. Defendant Lusk knew or should have known that a substantial risk of serious harm or severe injury to Plaintiff existed, should be presumed to have inferred that a substantial risk of serious harm and/or severe injury to Plaintiff existed and that his failure to protect Plaintiff could result in that serious harm or severe injury. *Wilson v. Falk*, 877 F.3d 1204, 1209 (10th Cir. 2017) (citing *Howard v. Waide*, 534 F.3d 1227, 1236 (10th Cir. 2008)).

Defendant Lusk knew or should have known of the danger associated with the death threats made against Plaintiff, as well as his documented custody issues and the snitch label he acquired by testifying against his co-defendant, and should have taken reasonable steps to protect him from serious harm and/or severe injury by (1) recommending Plaintiff (himself) request voluntary placement in protective custody or (2) initiating a review for involuntary placement in protective custody. Defendant Lusk had the ability/authority under CDOC policy to remove Plaintiff from the CSP general population and to initiate a review for involuntary placement in protective custody based upon the facts known to him and on the information contained in Plaintiff's records. *Cf. Gray v. Little*, 2021 U.S. Dist. LEXIS 137405 (July 23, 2021) (citing *Benefield v. McDowall*, 241 F.3d 1267 (10th Cir. 2001)).

Defendant Lusk knew of and disregarded the substantial risk(s) to Plaintiff's safety, *Farmer, supra* and *Howard, supra*, and willfully and wantonly placed him in the CSP general population in situations intended to create a risk of serious harm and/or severe injury. *Northington, supra*.

Defendant Lusk knew, or should have known, that placing Plaintiff in CSP general population would create (and in fact, did create) a substantial risk of serious harm and severe injury to Plaintiff, had knowledge of that present and substantial risk, and failed to act reasonably to protect Plaintiff.

Defendant Lusk was therefore deliberately indifferent to Plaintiff's documented need for protection and, through his willful and wanton acts and omissions, allowed Plaintiff to be housed in CSP general population under conditions posing a present and substantial risk of serious harm and/or severe injury at the hands of active [rival] gang members. *Farmer*, 511 U.S., at 833.

## E.    PREVIOUS LAWSUITS

Original form provided free of Charge by CO DOC Legal Services to
Offender _____LoVato_____ DOC# 113134
Date JUL 27 2022

Have you ever filed a lawsuit, other than this lawsuit, in any federal or state court while you were incarcerated? ___ Yes _X_ No (*check one*).

*If your answer is "Yes," complete this section of the form. If you have filed more than one previous lawsuit, use additional paper to provide the requested information for each previous lawsuit. Please indicate that additional paper is attached and label the additional pages regarding previous lawsuits as "E. PREVIOUS LAWSUITS."*

Name(s) of defendant(s):                    _____

Docket number and court:                  _____

Claims raised:                                  _____

Disposition: (is the case still pending?
has it been dismissed?; was relief granted?)  _____

Reasons for dismissal, if dismissed:        _____

Result on appeal, if appealed:              _____

## F.    ADMINISTRATIVE REMEDIES

*WARNING: Prisoners must exhaust administrative remedies before filing an action in federal court regarding prison conditions. See 42 U.S.C. § 1997e(a). Your case may be dismissed or judgment entered against you if you have not exhausted administrative remedies.*

Is there a formal grievance procedure at the institution in which you are confined?

_X_ Yes ___ No (*check one*)

Did you exhaust administrative remedies?

_X_ Yes ___ No (*check one*)

## G.    REQUEST FOR RELIEF

*State the relief you are requesting or what you want the court to do. If additional space is needed to identify the relief you are requesting, use extra paper to request relief. Please indicate that additional paper is attached and label the additional pages regarding relief as "G. REQUEST FOR RELIEF."*

**PROSPECTIVE RELIEF:** Plaintiff respectfully requests prospective relief in the form of Declaratory Judgment pursuant to the provisions of the Federal Declaratory Judgments Act (28 USCS §§ 2201, 2202), declaring that Defendants Thomas Little, David Lisac, John/Jane Doe #1, Daniel Dent, [?] White, James Johnson, Jackie Schaal, John/Jane Doe #2, John/Jane Doe #3, Larry Weingardner, Diana Travis, and Haley Hanson (the "DEFENDANTS") willfully and wantonly violated Plaintiff's rights through their individual and collective acts, omissions and other harms, and stating the Defendants duties with respect to those rights;

**COMPENSATORY DAMAGES:** Plaintiff respectfully requests compensatory damages be awarded against Defendants Thomas Little, David Lisac, John/Jane Doe #1, Daniel Dent, [?]

33   Original form provided free of Charge by CO DOC Legal Services to
Offender  Lovato                    DOC# 113134
Date      JUL 2 7 2022

White, Jackie Schaal, James Johnson, John/Jane Doe #2, John/Jane Doe #3, Larry Weingardner, Diana Travis, and Haley Hanson (the "DEFENDANTS") for their willful and wanton infliction of pain and suffering, permanent neurological disability and permanent physical pain and disability, as well as for psychological damage including (but not limited to), personal humiliation, mental anguish, injuries to quality of life, and the intentional infliction of emotional distress and suffering in an amount as yet to be deduced from the evidence, but in no event less than $ 150;000.00 each;

**PUNITIVE DAMAGES:** Plaintiff respectfully requests compensatory damages be awarded against Defendants Thomas Little, David Lisac, John/Jane Doe #1, Daniel Dent, [?] White, James Johnson, Larry Weingardner, Diana Travis, and Haley Hanson intended as punishment for their willful and wanton infliction of pain and suffering and to deter them and others from committing similar acts and omissions in the future in an amount as yet to be deduced from the evidence, but in no event less than $ 200,000.00 each;

**PUNITIVE DAMAGES:** Plaintiff respectfully requests compensatory damages be awarded against Defendants Jackie Schaal, John/Jane Doe #2, and John/Jane Doe #3 intended as punishment for their willful and wanton infliction of pain and suffering, and to deter them and others from committing similar acts and omissions in the future in an amount as yet to be deduced from the evidence, but in no event less than $ 300,000.00 each; and

**NOMINAL DAMAGES:** Plaintiff respectfully requests nominal damages be awarded in the amount of $ 1.50.

## H.    PLAINTIFF'S SIGNATURE

I declare under penalty of perjury that I am the plaintiff in this action, that I have read this complaint, and that the information in this complaint is true and correct. *See* 28 U.S.C. § 1746; 18 U.S.C. § 1621.

Under Federal Rule of Civil Procedure 11, by signing below, I also certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a non-frivolous argument for extending or modifying existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

Nov. 3rd 2022

~~July 27, 2022~~
(Date)

(Form Revised December 2017)

*William B. Lovato*
(Plaintiff's signature)

Original form provided free of Charge by CO DOC Legal Services to
Offender ___Lovato___    DOC# ___113134___
Date ___III 2 7 2022___

34